564 So.2d 950 (1990)
Ex parte Karen BEASLEY.
Re In the Matter of Barrett Ryan BEASLEY.
Re Karen BEASLEY
v.
Byron E. BEASLEY.
88-1373.
Supreme Court of Alabama.
February 2, 1990.
E.L. Brobston, Bessemer, for petitioner.
Elizabeth Potter Graham of Legal Aid Soc. of Birmingham, Inc., Guardian ad litem.
PER CURIAM.
We granted certiorari in this case to determine whether the Court of Civil Appeals erred in holding that the 1984 Child Protection Act, Ala.Code 1975, §§ 26-18-1 to 26-18-10, requires a juvenile court to make a "finding of dependency" before parental rights can be terminated. The trial court determined that a finding of dependency was not required; the Court of Civil Appeals, citing Ex parte Brooks, 513 So.2d 614 (Ala.1987), reversed. Because we hold *951 that, when one parent seeks to terminate the other parent's parental rights, a "finding of dependency," as a matter of law, is not required, we reverse the judgment of the Court of Civil Appeals,[1] and remand the cause with instructions.
In 1981, Karen Walker married Byron Beasley. Byron was initially employed in a steel plant located in Bessemer, Alabama, where Karen and Byron purchased a home. After Karen became pregnant, Byron quit his job at the steel plant and got a job transporting musical groups touring the country. When Karen gave birth to their son, Barrett Ryan Beasley, Byron was given a two-week leave of absence from his job so that he could spend time with Karen and the son. Despite the two-week leave given to him, Byron chose to return to his job transporting a musical group in California and thus left three days after his son's birth.
Upon leaving the hospital, Karen and the baby returned to their Bessemer home. Three months later, Karen and her infant were forced to vacate the house, because Byron had failed to mail Karen the required mortgage payments. The default in payments ultimately resulted in foreclosure.
Having no other place to live, Karen and her son moved in with her parents. Three months later, Karen divorced Byron. Because Byron was unemployed at the time of the divorce, Karen agreed not to seek child support payments from him. Byron was granted reasonable visitation with his son.
Next, Karen and her infant son moved to Texas, where they lived for two years. While Karen was living in Texas, Byron occasionally visited her, requesting to see his son. Occasionally, Byron made child support payments to Karen. In the meantime, Byron remarried. Following an argument between Karen and Byron, Byron did not again visit with his son for two years.
During that two-year absence by Byron, Karen and her son again moved back to Alabama in order to again live with her parents. Later, Byron and his second wife contacted Karen in order to reschedule visits with his son. During that period, Byron visited with his son during the weekends for five months.
After Karen requested that Byron permit her to change their son's last name to Walker, Karen's maiden name, she did not hear from Byron again until she was notified that he had filed a motion to modify the divorce judgment, seeking "set" visitation periods with his son. In response to Byron's motion, Karen filed a motion to terminate Byron's right of visitation granted in the divorce decree. After a hearing, at which Byron did not appear, the trial court held that Byron's sporadic visits had confused his son rather than created a meaningful parent/child relationship; therefore, the trial court terminated Byron's right of visitation.
Claiming that Byron had "abandoned" his son by withholding his presence, care, love, protection, maintenance, and display of filial affection from him, Karen filed a petition to terminate Byron's parental rights.
Following service of process by publication, the Family Court of Jefferson County held a hearing. Although Byron did not appear at that hearing, a guardian ad litem appeared to represent the child. The court heard conflicting testimony from Karen, Karen's father, and Byron's mother concerning Byron's fitness as a parent to his son. At the conclusion of that hearing, the court granted the mother's petition on the ground that there was evidence that Byron had "abandoned" his son, as that word is defined in Ala.Code 1975, § 26-18-3(1), and that his abandonment constituted sufficient grounds to terminate Byron's parental rights pursuant to Ala.Code 1975, § 26-18-7(a)(1). The court also stated that such a termination of parental rights would be in the "child's best interest." In its order, the court stated that under its interpretation of the 1984 Child Protection Act a "finding of dependency [was] not a requisite to granting a petition for termination of parental rights."
*952 The guardian ad litem, on behalf of the child, appealed to the Court of Civil Appeals, which reversed, holding that it "[could not] find that the 1984 Child Protection Act negates the necessity for the requisite finding of the child's dependency in any termination of parental rights regardless of whether the petition is brought by a parent or non-parent."
The purpose of the 1984 Child Protection Act is set out in § 26-18-2, which states:
"It is the purpose of this chapter to provide meaningful guidelines to be used by the juvenile court in cases involving the termination of parental rights in such a manner as to protect the welfare of children by providing stability and continuity in their lives, and at the same time to protect the rights of their parents. Appeals from an order terminating parental rights or refusing to terminate parental rights shall have precedence over all other cases in the court to which the appeal is taken. (Acts 1984, No. 84-261, p. 442, § 2.)" (Emphasis added.)
As stated by that section, the primary focus of a court in cases involving the termination of parental rights is to protect the welfare of children and at the same time to protect the rights of their parents. Inasmuch as the termination of parental rights strikes at the very heart of the family unit, a court should terminate parental rights only in the most egregious of circumstances. Moreover, the age-old principle that, as against a challenge by a nonparent, a parent who is neither unfit nor guilty of forfeiting his or her parental rights is entitled to custody has been strengthened rather than weakened by the 1984 adoption of the Uniform Child Protection Act. See Ex parte Johnson, 474 So.2d 715 (Ala.1985).
Mindful of the serious nature of terminating parental rights, this Court and the Court of Civil Appeals have stated that before a court can terminate an individual's parental rights it must apply a two-prong test. First, the court must make a "finding of dependency." Second, after it has determined that the child is "dependent," the court must inquire as to whether "all viable alternatives to termination have been considered." See Ex parte Brooks, 513 So.2d 614 (Ala.1987); Muffoletto v. Department of Human Resources, 537 So.2d 939 (Ala.Civ.App.1988); Wilson v. State Dep't of Human Resources, 527 So.2d 1322 (Ala.Civ.App.1988); Buchanan v. Department of Human Resources, 520 So.2d 539 (Ala.Civ.App.1988).
We begin our review by noting that nowhere in the Uniform Child Protection Act, Ala.Code 1975, §§ 26-18-1 to 26-18-10, does the Act require a "finding of dependency" by a court before it can order the termination of parental rights to a child. The grounds upon which a court can order the termination of parental rights are set forth in § 26-18-7, which reads as follows:
"(a) If the court finds from clear and convincing evidence, competent, material and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, as herein defined;
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child;
"(3) That the parent has tortured, abused, cruelly beaten or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat or otherwise maltreat the child, or the said child is in clear and present danger of *953 being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling;
"(4) Conviction of or imprisonment for a felony;
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent;
"(6) That reasonable efforts by the department of human resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, in addition to the foregoing, [the court] shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or judicial review.
"(c) In any case where the parents have abandoned the child as herein defined and such abandonment continues for a period of six months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents. (Acts 1984, No. 84-261, p. 442, § 7.)"
The Legislature, therefore, has established specifically the grounds upon which a court must base any order to terminate parental rights.
The Court of Civil Appeals, in the cases that set forth the two-prong test, drew its conclusions not from the Uniform Child Protection Act, but from § 12-15-1 et seq. ("the Juvenile Act") and Rule 25, A.R. Juv.P. The Juvenile Act and Rule 25, implicitly, though necessarily, speak in the context of the State's (or a nonparent's) petitioning for a termination of parental rights. These holdings are not incorrect in light of the context in which they were decided. The only case that may be interpreted as having enlarged the "finding of dependency" rule to permit a custodial parent to petition for such a finding is Brooks, which presented a peculiar set of facts upon which that holding was rendered. Section 12-15-65(e) and Rule 25 require a showing of dependency; however, that statute and that rule preceded the adoption of the Uniform Child Protection Act, which sets out the factors to be considered in terminating parental rights. Indeed, the statutory burden of proof will, in fact, not be met in many cases without a showing of dependency, whether the petitioner is a parent or a nonparent.
We recognize that Brooks contains language susceptible to two meanings. However, the language in Brooks stating that "the court must determine from clear and convincing evidence that the child is dependent" referred to determining the child's best interest when both parents had consented to terminate the father's parental rights. It is noteworthy that two of the three cases cited in Brooks[2] were decided in the context of a mother's contest of the State's petition to terminate the mother's parental rights, after the mother had consented to the adoption of her child. The *954 third case[3] was decided in the context of a mother's contest of the State's petition to terminate her parental rights because of her unfitness as a parent and her cruelty to the child. Certainly, in the contexts of those three cases, the requirement of a determination of the child's dependency was necessary to protect the parent against unwarranted intrusions by the State.
Except for Brooks, which was decided in a novel and peculiar factual context, we find no authority for the proposition that where one parent seeks to terminate the other's parental rights the petitioning parent must show that the child is "dependent," as that term is statutorily defined. To so hold would, under many conceivable circumstances, require proof that the child was being improperly cared for by the petitioner. Such a requirement, in a given case, may destroy a custodial parent's standing to bring an otherwise meritorious claim to terminate the noncustodial parent's parental rights. To the extent that certain language in Brooks may be interpreted to require a determination of the child's dependency in the case of one parent's seeking to terminate the parental rights of the other parent, that language is overruled; and we hold, in the context of this case, as did the trial court, that the petitioning mother need not prove that her child is a dependent as a requisite element of her proof that the father's parental rights should be terminated.
Stated otherwise, a distinction must be drawn between the State's seeking to terminate parental rights and a parent's seeking to terminate the other parent's parental rights. Where the State seeks to terminate parental rights, the "finding of dependency" necessarily applies to the State to protect against an unwarranted intrusion into parental rights and to comply with the requirements of due process. Parental rights are indeed cherished and deserve the law's utmost protection against unwarranted interference.
In viewing the "dependency" issue in the context of the State's attempt to terminate parental rights, the State would have standing only where both parents are found to be unfit or otherwise unable to discharge the responsibilities of parenthood. Therefore, a finding of "dependency" would be warranted, and the State would have a duty to act in accordance with that child's best interest.
Conversely, when one parent seeks to terminate the other parent's parental rights, a "finding of dependency" is not required. As stated above, if a "finding of dependency" were a requisite element of proof, the following illogical result could arise: The petitioning parent, who is adequately caring for the child, would have to prove that he or she is not providing adequate care for the child and, therefore, could then be estopped from bringing such an action. We hold, therefore, that, when one parent seeks to terminate the other parent's parental rights, a "finding of dependency" is not required, and the trial court should determine whether the petitioner has met the statutory burden of proof and whether that termination is in the child's best interest, in light of the surrounding circumstances.
The two-prong test that a court must apply in a parental rights termination case brought by a custodial parent consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in § 26-18-7. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. (As earlier discussed, if a nonparent, including the State, is the petitioner, then such a petitioner must meet the further threshold proof of dependency.)
Once the court has complied with this two-prong testthat is, once it has determined *955 that the petitioner has met the statutory burden of proof and that, having considered and rejected other alternatives, a termination of parental rights is in the best interest of the childit can order the termination of parental rights. Such a construction of the Uniform 1984 Child Protection Act clearly comports with the stated purpose for the Act.
In so holding, however, we are not to be understood as expressing any opinion on the merits of the mother's proof in this case with respect to her right to have the father's parental rights terminated. The merits of the mother's petition must be tested against the public policy that requires clear and convincing evidence "that termination of [a father's] parental rights [was] the appropriate remedy." Brooks, 513 So.2d at 617.
We note that the Court of Civil Appeals did not address in its opinion whether the second prong of the two-prong test was met. In fact, that Court specifically said that "other issues raised by the guardian ad litem are pretermitted."
Our examination of the record indicates that the child, represented by a guardian ad litem, was the appellant in the proceeding before the Court of Civil Appeals, and the record indicates that the guardian ad litem raised, among other issues, the issue of whether other alternatives, less drastic than termination of parental rights, were available to protect the best interests of the child.
Because the Court of Civil Appeals did not address this issue, we remand the cause to the Court of Civil Appeals for further proceedings consistent with this opinion and specifically for a consideration of the issues raised by the guardian ad litem.
Based on the foregoing, the judgment of the Court of Civil Appeals is reversed, and the cause is remanded to that Court for proceedings consistent with this opinion.
REVERSED AND REMANDED, WITH DIRECTIONS.
HORNSBY, C.J., and JONES, ADAMS, STEAGALL and KENNEDY, JJ., concur.
MADDOX, ALMON, SHORES and HOUSTON, JJ., concur in the result.
MADDOX, Justice (concurring in the result).
I concur in the result reached, but I disagree with that portion of the opinion that states that there must be a "finding of dependency" when the State or a non-parent[4] is the petitioner. The Uniform Child Protection Act of 1984 makes no such requirement, and the cases of this Court and the Court of Civil Appeals that construe the Child Protection Act to make such a requirement are clearly wrong and should be overruled.[5]
Admittedly, before the adoption of the Uniform Child Protection Act, the State was required, under the provisions of the Alabama Juvenile Proceedings Statute, Ala.Code 1975, §§ 12-15-1 through XX-XX-XXX (the substantive statute that governed in child custody and termination of parental rights proceedings), to prove that a child was "dependent" before the State could obtain permanent custody and a termination of parental rights. The procedure used prior to the adoption of the Uniform Child Protection Act is set out in Miller v. Alabama Dep't of Pensions & Security, 374 So.2d 1370 (Ala.Civ.App.1979):
"The standard that has been applied by the courts of this state in child custody cases even where the state is involved is the best interest of the child. Lovell v. Department of Pensions and Security, Ala.Civ.App., 356 So.2d 188 (1978). We also said in that case that the parents *956 have a prima facie right to the custody of their child but that this right is not absolute and must yield to the superior requirement of what is in the best interest and welfare of the child.
"In deciding what is in the best interest of a child who is the subject of a custody dispute, the courts of this state consider many factors, among which would be conduct of the parents toward the child, family environment, health of the child, physical and emotional abuse of the child, abandonment of the child, love of and interest in the child by the parents, and activities of the parents that would be detrimental to the safety and welfare of the child. Foremost among the listed factors, especially in a situation where the state is seeking a termination of parental rights, would be less drastic measures than permanent removal of parental custody. Lovell, supra. For example, a court would certainly consider returning the child to parental custody on a trial basis subject to certain definite conditions being met and subject to supervision by DPS workers or other trained personnel; or temporary custody in a foster home with specific visitation with the child and conduct requirements to be met by parents; or that the parents are to be deprived of custody temporarily pending a correction of deficiencies in the home environment that were having or would have a harmful effect on the child should the child be placed back in the family relationship."
Under that procedure, admittedly the State, or anyone else petitioning for permanent custody of a child, had to prove that the child was, in fact, "dependent."[6]
The Uniform Child Protection Act of 1984, in my opinion, changed that procedure. It is a comprehensive act that now provides for the procedure and the substantive grounds that must be proved in a termination of parental rights case, such as: (1) the person or entities who may file a petition (Ala.Code 1975, § 26-18-5), (2) the procedure to be used for consideration of such petitions, and (3) the grounds that must be alleged and proved.

PROCEDURE
The procedure for the termination of parental rights is set out in Ala.Code 1975, § 26-18-4, which provides that "[u]nless otherwise provided herein, proceedings to terminate parental rights shall be governed by Title 12, chapter 15, article 3 and by the Alabama Rules of Juvenile Procedure." That statute provides for the procedure to be used in such cases, and the heading of *957 that statute in the Code clearly shows that. That statute does not, however, as the majority contends, make a "finding of dependency" a requirement in cases filed by the State or a nonparent. The majority finds this requirement outside the statute and engrafts it onto the statute.

PARTIES
The parties in a termination of parental rights case are determined in accordance with the provisions of Ala.Code 1975, § 26-18-5, which provides for the class of persons and entities authorized to file a petition. It provides that "[a] petition may be filed by a public or private licensed child-placing agency or parent, with permission of the court, or any interested party." That section makes no distinction, as the majority does, between a parent, the State, or a non-parent. Again, the majority engrafts that distinction onto the statute.

GROUNDS
The grounds that must be proved are set out in Ala.Code 1975, § 26-18-7, which provides:
"(a) If the court finds from clear and convincing evidence, competent, material and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, as herein defined;
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child;
"(3) That the parent has tortured, abused, cruelly beaten or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat or otherwise maltreat the child, or the said child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling;
"(4) Conviction of or imprisonment for a felony;
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent;
"(6) That reasonable efforts by the department of human resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, in addition to the foregoing, [the court] shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or judicial review.

*958 "(c) In any case where the parents have abandoned the child as herein defined and such abandonment continues for a period of six months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents. (Acts 1984, No. 84-261, p. 442, § 7.)"
The majority correctly states that "nowhere in the 1984 Child Protection Act, Ala.Code 1975, §§ 26-18-1 to 26-18-10, does the Act require a `finding of dependency' by a court before it can order the termination of parental rights to a child," but then says that when the State is the petitioning party, that "a finding of `dependency' would be warranted." The majority simply engrafts a requirement which is not contained in the Act.
It is obvious that in most cases, if not in all cases, involving the termination of parental rights, a child will be "dependent" in the broad definition of that term, or as that term is defined in Ala.Code 1975, § 12-15-1(10), but the Child Protection Act does not make a distinction in the measure of proof based on who the petitioning party is. Subsection (b) of Ala.Code 1975, § 26-18-7, does require additional proof "where the child is not in the physical custody of its parent or parents." While the proof of the statutory grounds would necessarily show in most, if not in all, cases, that the child was, in fact, "dependent," that is not a necessary allegation, nor must dependency be proved.
The statute does provide that the court is not limited to the grounds set out in the Uniform Child Protection Act, but to make a "finding of dependency" a necessary requirement, in my judgment, rewrites the statute to require a burden of proof that admittedly is not included within the statute. If a petitioner, authorized to file a petition under § 26-18-5, proves the grounds required to be proved under § 26-18-7, I believe that is all that is or should be required.
Because this case does not involve a factual situation in which the State or a nonparent is the petitioner, all that is stated in the majority opinion regarding the burden of proof is dictum, but because dictum sometimes has a habit of growing full-blown into precedent, I felt compelled to express my views on the matter, in the hope that the rule of law will be corrected before it becomes entrenched.[7]
*959 I concur completely in the result reached, and naturally concur that Ex parte Brooks, 513 So.2d 614 (Ala.1987), must be modified. I write specially only for the purpose of expressing my disagreement with the dictum in the opinion of the majority that makes a "finding of dependency" necessary in cases in which the State or a nonparent is the petitioner. I believe the Uniform Child Protection Act of 1984 provides not only who can be a petitioner, but the procedures to be used and the grounds that must be alleged and proved. To require more, in my judgment, is wrong.
NOTES
[1] In re Beasley, 564 So.2d 948 (Ala.Civ.App. 1989).
[2] In the Matter of Colbert, 474 So.2d 1143 (Ala. 1985) (cited in Brooks as Clemons v. Alabama Department of Pensions & Security); and In re Brand, 479 So.2d 66 (Ala.Civ.App.1985).
[3] Fortenberry v. Alabama Department of Pensions & Security, 479 So.2d 54 (Ala.Civ.App. 1985).
[4] While the majority's opinion talks of the requirement of a "finding of dependency" when the State is the petitioner, the language used implies that any other nonparent petitioner (such as a guardian ad litem or a grandparent) would have the same burden.
[5] Ex parte Brooks, 513 So.2d 614 (Ala.1987); Muffoletto v. Department of Human Resources, 537 So.2d 939 (Ala.Civ.App.1988); Wilson v. State Department of Human Resources, 527 So.2d 1322 (Ala.Civ.App.1988); Buchanan v. Department of Human Resources, 520 So.2d 539 (Ala.Civ.App.1988).
[6] "Dependent child" is defined in Ala.Code 1975, § 12-15-1(10), which reads as follows:

"(10) DEPENDENT CHILD. A child:
"a. Who, for any reason is destitute, homeless or dependent on the public for support; or
"b. Who is without a parent or guardian able to provide for his support, training or education; or
"c. Whose custody is the subject of controversy; or
"d. Whose home, by reason of neglect, cruelty or depravity on the part of his parent, parents, guardian or other person in whose care he may be, is an unfit and improper place for him; or
"e. Whose parent, parents, guardian or other custodian neglects or refuses, when able to do so or when such service is offered without charge, to provide or allow medical, surgical or other care necessary for such child's health or well-being; or
"f. Who is in such condition or surroundings or is under such improper or insufficient guardianship or control as to endanger his morals, health or general welfare; or
"g. Who has no proper parental care of guardianship; or
"h. Whose parent, parents, guardian or custodian fail, refuse or neglect to send such child to school in accordance with the terms of the compulsory school attendance laws of this state; or
"i. Who has been abandoned by his parents, guardian or other custodian; or
"j. Who is physically, mentally or emotionally abused by his parents, guardian or other custodian or who is without proper parental care and control necessary for his well-being because of the faults or habits of his parents, guardian or other custodian or their neglect or refusal, when able to do so, to provide them; or
"k. Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child; or
"l. Who has been placed for care or adoption in violation of the law; or
"m. Who for any other cause is in need of the care and protection of the state; and
"n. In any of the foregoing, is in need of care or supervision."
[7] Mr. Justice Jones, writing for the majority in Lorence v. Hospital Board of Morgan County, 294 Ala. 614, 320 So.2d 631 (1975), overruled a case that was only five years old and, in doing so, chided courts for failure to examine prior cases, and said the following:

"We do not overrule old case law lightly or flippantly. But, where precedent can no longer be supported by reason and justice, we perceive it our duty to reexamine, and if need be, overrule court made law.
"The quaint poetic lines of Sam Walter Foss put in perspective the philosophy of those courts which feel compelled to sacrifice their sense of reason and justice upon the altar of the Golden Calf of precedent.
"One day through the primeval wood
"A calf walked home, as good calves should;
"But left a trail all bent askew,
"A crooked trail, as all calves do.
"Since then, three hundred years have fled,
"And, I infer, the calf is dead.
"But still he left behind this trail,
"And thereby hangs my moral tale.
"The trail was taken up the next day
"By a lone dog that passed that way;
"And then a wise bell-wether sheep
"Pursued the trail o'er vale and steep,
"And drew the flock behind him, too,
"As good bell-wethers always do.
"So from that day, o'er hill and glade,
"Through those old woods a path was made,
"And many men wound in and out,
"And bent and turned and dodged about,
"And uttered words of righteous wrath,
"Because `twas such a crooked path;
"But still they followeddo not laugh
"The first migrations of that calf,
"And through this winding woodway stalked
"Because he wabbled when he walked.
"This forest path became a lane,
"That bent and turned and turned again;
"This crooked lane became a road,
"Where many a poor horse, with his load,
"Toiled on, beneath the burning sun,
"And traveled some three miles in one.
"And thus a century and a half
"They trod the footsteps of that calf.
"The years passed on with swiftness fleet,
"The road became a village street,
"And this, before men were aware,
"A city's crowded thoroughfare.
"And soon the central street was this
"Of a renowned metropolis.
"And men two centuries and a half
"Trod the footsteps of that calf.
"Each day a hundred thousand rout
"Followed the zigzag calf about;
"And o'er his crooked journey went
"The traffic of a continent.
"A hundred thousand men were led
"By one calf near three centuries dead.
"They followed still his crooked way,
"And lost one hundred years a day;
"For thus such reverence is lent
"To well-established precedent.
"A moral lesson this might teach,
"Were I ordained and called to preach.
"For men are prone to go it blind
"Along the calf-paths of the mind,
"And toil away from sun to sun
"To do what other men have done.
"They follow in the beaten track,
"And out and in, and forth and back,
"And still their devious course pursue
"To keep the path that others do.
"But how the wise old wood-gods laugh,
"Who saw the first primeval calf!
"Ah! many things this tale might teach;
"But I am not ordained to preach."