This matter concerns the termination of parental rights to four minor children, J.H.H., T.M.H., D.K.H., and G.E.H. The Madison County Department of Human Resources (DHR) filed four petitions to terminate the parental rights of D.H., the mother; T.H., the father of two of the children; L.H. and T.G., the legal father and the putative father of the other two children. It is undisputed that D.H., the mother, was married to T.H., the biological father of the first two children, J.H.H. and T.M.H. The mother, after divorcing T.H., married L.H. At the time of trial the mother was still married to L.H.; however, while L.H. is the legal father of D.K.H. and G.E.H., he is not the biological father. The putative father of these two children is T.G. The trial court, in its final order, treated both L.H. and T.G. as if they were both the fathers of D.K.H. and G.E.H.
Following the presentation of ore tenus evidence, the trial court terminated the parental rights of the mother and all the fathers and vested permanent custody in DHR. Only the mother and T.G. appeal.
The dispositive issue before this court is whether the trial court erred in terminating the parental rights to these children and in finding no less drastic alternatives available.
Initially, we recognize that every parent has a prima facie right to custody of their children. In re Moore, 470 So.2d 1269
(Ala.Civ.App. 1985). This prima facie right can only be overcome by clear and convincing evidence that the children's best interests would be served by removing the children from the parents' custody. East v. Meadows, 529 So.2d 1010
(Ala.Civ.App. 1988). It is this consideration for the best *Page 275 
interests of the children which lies at the heart of every proceeding to terminate parental rights. East.
The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities. § 26-18-7, Code 1975. Some of the considerations which the trial court is required to use are whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. §26-18-7(a), Code 1975. If the children are not in the physical custody of their parent or parents, the trial court also may consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached in court. § 26-18-7(b), Code 1975.
In this case, DHR instituted proceedings to terminate the parental rights. In cases such as this, where a nonparent is the petitioner, the trial court's determination is governed by the application of a two-pronged test. Ex parte Beasley,564 So.2d 950 (Ala. 1990). First, the court must conclude, from clear and convincing evidence, that the child is dependent.Beasley. Second, the court must consider and reject all other viable alternatives to termination of parental rights so that it can conclude that termination is in the child's best interests. Beasley. Additionally, the trial court's determination on these matters is presumed correct on appeal, and we will not reverse absent a determination that the court's judgment is so unsupported by the evidence as to be plainly and palpably wrong. Brooks v. State Dep't of Human Resources,513 So.2d 632 (Ala.Civ.App. 1987).
Here, the court considered testimony from a DHR supervisor, a DHR social worker, a court-appointed juvenile advocate, the mother, and T.G. Testimony revealed that DHR first became involved with this family in March of 1984, when they began receiving phone calls from family and community members and an ambulatory care unit, regarding inadequate housing with no running water, an inadequate supply of food in the house, and lack of appropriate medical treatment for the children. At the time, the mother was married to T.H., who is the biological and legal father of their two children, J.H.H. and T.M.H. There was no court intervention at that time, but DHR became actively involved with the family. They provided services and continued contact with the family on a monthly basis in order to stabilize their living arrangements. The family, consisting of the mother, T.H., and their two children, had several living arrangements which included living with family members and in a one-room apartment behind a pool hall.
In 1985, the family moved to West Virginia, and DHR lost contact with them for a few months until they returned to Alabama. In 1986, the mother divorced T.H. and married L.H. The family lived with the mother's family for one month, in a trailer park for four months, and with L.H.'s sister for one year. Although at the time of trial the mother was still married to L.H., she had been living with T.G. since 1987. T.G. claims to be the biological father of both D.K.H. and G.E.H.
DHR again began receiving reports of problems concerning the children which included a lack of housing, possible abuse of J.H.H. and T.M.H., and a lack of appropriate medical care for G.E.H. One call to DHR was received from hospital employees concerning G.E.H. The mother was with G.E.H. at the hospital, and G.E.H. was suffering from a severe body rash stemming from a condition known as eczema. The mother had failed to give the child medication prescribed by a doctor; consequently, the condition worsened. Ms. Smith testified that, at this point, the children were sick, and the mother did not have a place to live. On February 23, 1989, a pick-up order was issued, and the three children were placed in shelter care. Temporary *Page 276 
custody was awarded to DHR on May 15, 1989. On April 6, 1989, the mother gave birth to the fourth child, D.K.H. The mother was without utilities and had only a meager supply of food for the new baby. A DHR representative offered the mother transportation in order to pick up more food, but the mother declined the offer. On May 16, 1989, a pick-up order was granted, and the baby was subsequently placed in shelter care along with the other three children.
Testimony at the time of the trial revealed that since 1987 the family had lived with the mother's sister, in motels, in an apartment, with T.G.'s brother, in a car, and with friends. The mother lived in a mission home and with her sister from 1989 until 1990 while T.G. was serving time in prison.
Evidence was presented that the mother has a ninth-grade education. She has not taken the GED exam, and she has no vocational training. At the time of trial she was 29 years old. The mother testified that she has had several jobs, but has been unable to maintain one job for more than three months. At the time of trial the mother was unemployed. The record reveals that on June 26, 1985, a report was received by DHR of abuse of T.M.H. by the mother, which she denied. The family moved to West Virginia, and an investigation of the abuse could not be completed. Also in 1985, the mother was picked up by the sheriff's department at 9:00 p.m. walking in the street with her children. The report indicated that the mother had been drinking.
No written agreement was entered into between DHR and the parents; however, DHR provided homemaker services to the family from April 1989, until February 1991. They also offered parenting classes and counseling services. The mother entered parenting classes, but failed to complete a single session, completely missing many of the sessions. T.G. neither attended parenting classes nor counseling sessions. Neither the mother nor T.G. have provided financial support for the children since they have been in foster care. This court recognizes that these four children have been in foster care for approximately three years. At the time of trial, the children were 8, 7, 3, and 2 years old respectively. One of the children, D.K.H., has lived all but three weeks of her short life in foster care.
The record reveals that T.G. was treated at a children's psychiatric center at the age of 13, and he was later transferred to a hospital in Dayton, Ohio. He was treated for nerves and was prescribed Thorazine until he was almost 15 years old. Testimony revealed that T.G. had spent five years in federal prison for interstate transportation of stolen cars. T.G. later served a year and a half in an Ohio prison for stealing a car. Further testimony from T.G. and Ms. Smith, a DHR supervisor, confirmed that T.G. was incarcerated for theft of services from mid 1989 until late 1990. While in prison for theft of services, T.G. was allowed to participate in a work release program. He escaped from the program and returned to the prison two weeks later. T.G. testified that he has been incarcerated two to three times for driving with a suspended license. A report in the record contains some allegations of sexual abuse of T.M.H. by T.G., but these claims were never proven.
T.G.'s work history has been sporadic as well. At the time of trial, T.G. had been working for two different wrecker services. Since 1987, he has worked as a mechanic for his brother for one month, in auto sales, for a transmission company for one month, for a landscaping company for three months, and for a gas station until he was laid off.
As to viable alternatives available to the trial court as resources for these children, the evidence showed that the only relatives expressing an interest in caring for the children, without dividing them, later renounced that interest. Ms. Smith testified that the only relative resources approved by DHR for these children were T.G.'s brother and sister-in-law. Ms. Virginia Carden, a court-appointed juvenile advocate, testified that she became concerned about the children's placement in the home *Page 277 
of the brother and sister-in-law when they failed to take the children home with them, although they knew the court was willing to allow this placement.
In view of the above, we cannot hold that the trial court's judgment is so unsupported by the evidence as to be plainly and palpably wrong. We find that there was clear and convincing evidence that the children were dependent, that there were no other viable alternatives to termination of parental rights, and that termination was in the children's best interests.
The mother and T.G. also argue on appeal that the remarks of the juvenile judge, namely that if DHR did not proceed to terminate parental rights then it would be guilty of gross neglect, exhibited such a bias against the parents that a fair trial was prohibited. We first note that in Alabama a judge is presumed to be qualified and unbiased with the burden on the moving party to prove to the contrary. Ex parte Rives,511 So.2d 514 (Ala.Civ.App. 1986). The parents in this case have not demonstrated that the trial judge was biased. Furthermore, if they did feel that during the trial the judge exhibited such bias that a fair trial was prohibited, their proper action would have been to ask the judge to recuse himself. This never occurred.
DHR is correct in its assertion that mandamus is the proper method by which to review whether recusal is required. Ex parteMelof, 553 So.2d 554 (Ala. 1989). In the case before us, no petition for a writ of mandamus was filed, neither was there any evidence before us that recusal was requested.
The trial court's judgment is due to be affirmed.
AFFIRMED.
THIGPEN and RUSSELL, JJ., concur.