THOMPSON, Judge.
On April 2, 2001, the Madison County Department of Human Resources (“DHR”) filed three separate petitions seeking to terminate the parental rights of D.F.L.C. (“the mother”) and G.A.R. or M.D.C., the alleged fathers, to G.A.R.J., L.D.R., and H.L.R. (“the children”). On January 4, 2002, one of the alleged fathers, G.A.R., stipulated to the paternity of the children (G.A.R. is hereinafter referred to as “the father”); the mother consented to this stipulation. On April 29, 2002, and May 5, 2002, the trial court held a final hearing at which it received ore tenus evidence. On June 25, 2002, the trial court entered three separate orders terminating the mother’s, as well as the father’s, parental rights to the children. The mother appealed.
At the time of the hearing, the mother was 34 years old, G.A.R.J. was 3 years old, L.D.R. was 19 months old, and H.L.R. was 8 months old. The mother was married to another man, M.D.C., at the time the children were conceived and was still married to M.D.C. at the time of the hearing.[1] The record indicates DHR first became involved with the mother in March 1992, when DHR received complaints that her two children — both daughters, ages 16 years and 11 years at the time of the hearing — were being inadequately supervised and that their food was inadequate.[2] In February 1994, DHR intervened following complaints of sexual abuse and inadequate supervision of the daughters. At that time, DHR became aware that the mother was addicted to crack cocaine. The mother successfully completed a drug-rehabilitation program in August 1994. DHR remained involved with the family through April 1998, when DHR closed the *71 case. At the time of the hearing, both daughters had been removed from the mother’s custody.
Ondria Moore (“Moore”), a DHR social worker, testified that she has been providing services to the mother since September 29, 1998, when Huntsville Hospital reported that the mother had given birth to G.A.R.J.; both the mother and G.A.R.J. tested positive for cocaine. DHR followed up with the mother in an effort to rehabilitate her and ordered her to undergo a drug assessment. At the time of G.A.R.J.’s birth, the mother was unemployed and was living in public housing. During the mother’s attempt at rehabilitation, G.A.R.J. was placed with the mother’s sister. Moore testified that a safety plan was put into place, allowing the mother to visit G.A.R.J., but only with the immediate supervision of the mother’s sister. G.A.R.J. remained in the sister’s care until June 27, 2000, when G.A.R.J. was found living in the Scottish Inn Motel with the mother. Moore testified that G.A.R.J. was then placed with the mother’s niece. DHR put another safety plan into place, but, Moore testified, the niece did not follow the safety plan. G.A.R.J. was removed from the niece’s care and placed in foster care. At that time, he was approximately one year old.
Moore testified that on August 11, 2000, Crestwood Hospital notified DHR that the mother had given birth to L.D.R.; at that time, both the mother and L.D.R. tested positive for cocaine. DHR removed L.D.R. from the hospital and placed L.D.R. in a foster home qualified to cope with “medically fragile” children. On August 2, 2001, the mother gave birth to H.L.R. Moore testified that, soon after H.L.R.’s birth, DHR petitioned for custody of H.L.R. based on the parents’ history and the mother’s failure to follow through with treatment for her drug dependency. Moore did not know if H.L.R. tested positive for cocaine.
Moore testified that the mother and father were given random drug screens beginning in February 1999. Moore provided the court with a detailed listing of the dates and results of each of those tests. Moore testified that she would give the mother a piece of paper to take to Quest Diagnostics, an independent testing lab, within 24 hours for a drug screen. If the mother did not report to the lab for the drug screen and DHR did not get test results back from the lab, DHR considered the test result a positive screen for drugs. Moore testified that the reasoning behind this policy was if the person ordered to take the test did not show up for the test, they were generally thought to have recently taken drugs. Moore testified that she made 27 requests to the mother for drug screens between February 1999 and December 2001; of those 27 requests, the first two were negative for drugs. The mother failed to comply with the drug screens ordered between February 26, 1999, and March 2, 2000. Moore testified that on August 11, 2000, the mother tested positive for cocaine while in the hospital after giving birth to L.D.R. Moore testified that the drug screens ordered in June 2001 and July 2001, one in each month, were negative for drugs, but that from August 18, 2001, to January 15, 2002, the mother did not comply with DHR’s drug-screen requests. Moore testified that the mother claimed she did not comply with the drug-screen requests because she did not have the photo identification necessary for the test to be administered.
Moore testified that DHR made approximately 15 drug-screen requests to the father. The father tested negative for drugs in June 2001 and July 2001. Moore testified that from August 17, 2001, to March 14, 2002, the father failed to comply with *72 DHR’s requests for drug screens. Moore testified that both the mother and father tested positive for cocaine in 2002 while the termination case was pending. On April 3, 2002, the mother tested negative; however, the screen result noted that the specimen was diluted. Moore testified that for testing purposes a diluted specimen is not considered an accurate specimen. Moore made the last drug-screen request of the mother on April 17, 2002, but the mother had failed to comply with DHR’s request as of the time of trial.
Moore testified that DHR ordered the mother to attend Family Options, a program that provides intensive home services to help parents learn how to maintain a home and better parenting skills. Moore testified that in August 1999 the mother was terminated from the Family Options program for noncompliance. On cross-examination, Moore testified that the mother lived in a clean, furnished apartment with two bedrooms and one bath. Moore testified that the mother has been cooperative at DHR meetings and that she had not exhibited signs of being under the influence of drugs during the meetings.
Moore testified that she prepared a “Permanent Custody Hearing Court Report” for the final hearing. Because of several continuances in the case, Moore also prepared an addendum to her original report to the trial court; both were admitted as exhibits at trial. Moore testified that the mother and father have never parented the children. Moore testified that DHR fully considered family placements for the children with the mother’s brother, sister, and niece; however, after careful review, Moore testified, those placements were not a viable option for the children. Moore further testified that the father suggested that the children be placed with his mother; however, the father’s mother declined to help because she was already caring for four children belonging to another son. Moore testified that at the time of trial, there were no family placements for the children.
Moore testified that the children are currently in the same foster home. Moore testified that G.A.R.J. and L.D.R. are doing well in foster care. Moore testified H.L.R. suffers from acid reflux, “RSV,” and breathing problems; however, she is being successfully treated for the problems while in foster care.
Samantha Wayland, a substance-abuse therapist with the Madison County Health Center, testified that she has been seeing the mother as a patient since 1999 when DHR sent the mother for a psychosocial assessment. Wayland testified that she recommended the mother for outpatient treatment because the mother admitted her baby had tested positive for cocaine but stated that she had not used drugs since September 1998. Wayland testified that the mother went to New Horizons, a division of the Mental Health Center, for outpatient treatment. Wayland testified that the mother did not complete the program and that on May 7, 1999, treatment was terminated. The mother scheduled an appeal appointment with New Horizons and on June 1, 1999, was allowed to restart the program. On June 4,1999, the mother was discharged for noncompliance. Way-land testified that the mother scheduled individual appointments with her but failed to show up. On September 17, 1999, the mother attended a second appeal appointment and was recommended for treatment at the Mental Health Center. Wayland testified that she was unaware of the mother’s attending the recommended treatments at the Mental Health Center.
Wayland testified that she next saw the mother in September 2000 after DHR referred her for another drug assessment. Wayland testified that the mother did not *73 follow through with the suggested outpatient treatment plan and was discharged on October 26, 2000, for failing to attend. Wayland testified that she recommended the mother undergo inpatient treatment because of her problems attending treatment, her drug use, and her inability to meet treatment standards. Wayland testified that the mother admitted her continued use of cocaine as recently as November 2000. The mother never made it into an inpatient-treatment facility, because, Wayland testified, the mother was arrested and subsequently incarcerated in early February 2001.[3]
In April 2001, DHR referred the mother for another drug assessment. Wayland testified that the mother was diagnosed as being cocaine dependent with “severe physiological dependence in early remission” and was ordered to attend inpatient treatment. The mother completed the 28-day inpatient-treatment program and was then referred for continued outpatient treatment through New Horizons; however, she did not complete the program and was discharged on December 7, 2001, because of poor attendance. Wayland testified that the last group session the mother attended was on November 8, 2001, and that the mother failed to complete a drug screen at that time. Wayland testified that the mother was previously a patient of the Mental Health Center in 1994 for alcohol and cocaine abuse. In Wayland’s professional opinion, the mother is still in need of treatment for drug dependency.
Sakina Bolden, a case manager at New Horizons Substance Abuse Outpatient Center, testified that she had worked with the mother for seven months. Bolden testified that as a case manager she assesses the client’s needs, which include housing needs, employment needs, and educational needs. During that time, the mother has failed to show up for four scheduled appointments; she rescheduled two of those appointments, but never showed up for them or cancelled them.
The mother testified that she lives in an apartment with her oldest daughter and that the father regularly stays in the apartment. The mother testified that she is unemployed but receives $545 in Social Security benefits for her oldest daughter, who is not in school. In addition, the mother testified that she enrolled at Virginia College on February 17, 2002, and received a $1,189 disbursement from a “Pell Grant.” The mother testified that she purchased an automobile with money she received from the Pell Grant; however, the mother testified that her driver’s license is suspended. The mother testified that she has a B/C average at Virginia College and that her grades dropped because of irregular attendance. The mother expects to graduate on April 3, 2003, with an associates degree.
The mother testified that she hoped DHR would give her another chance to parent the children. The mother testified that she visited G.A.R.J. and L.D.R. during her scheduled visitation time at DHR. The mother testified that she recently enrolled in a “drug court program” in order to help her maintain her sobriety. On cross-examination, the mother testified that she could not remember the last time she used cocaine. Upon further cross-examination, the mother admitted that she smoked crack cocaine within the last month before the termination hearing. The mother testified that she is currently serving two years’ probation for a “school *74 violation” and a theft charge. The mother testified that the “school violation” charge was the result of her oldest daughter’s not going to school for 10 days.
Kim Thurston, a Madison County probation officer, testified that she was also the drug court coordinator and was working with the mother in that capacity. Thur-ston testified that the mother was supposed to contact her on a Friday but as of trial had failed to contact her. Thurston testified that on the same day the mother was supposed to contact Thurston, the mother was visiting a probation office just down the hall from Thurston’s office.
Sonya Humphrey-Okeleke, the apartment manager of the mother’s apartment complex, testified that the father lives in the apartment with the mother. Okeleke testified that the mother has not informed her that the father is a tenant in the apartment. Okeleke testified that the mother owes $640 in arrears on her apartment rent and that the mother is consistently late with her rent payment.
The father testified that he is currently “between homes.” The father testified that he occasionally spends the night at the mother’s apartment and that he also spends the night at local motels. The father testified that he has not technically moved out of the mother’s apartment. The father testified that he is self-employed at Rowe Irrigation and Landscaping. The father testified that his five children from a previous marriage live in Detroit, Michigan, and that he sends his former wife $100 in child support for those children each month in the form of a money order. The father does not have a checking account. The father testified that he is currently looking for a house.
The father testified that he has three prior convictions for assault and domestic violence. The father testified that the last time he used cocaine was in 1996. The father denied testing positive for cocaine on April 3, 2002 and April 4, 2002; however, the test results attached to Moore’s court report indicate that the father tested positive for cocaine use. The father testified that his mother was now willing to take the children and care for them. On cross-examination, the father could not explain why he did not suggest his family for placement of the children before the final hearing.
On appeal, the mother asserts that the trial court erred in terminating her parental rights. Following an ore tenus proceeding, the trial court’s determination of factual issues is presumed correct and will not be disturbed on appeal absent a showing of palpable error. F.L.L. v. State Dep’t of Human Res., 612 So.2d 501 (Ala. Civ.App.1992). This court has consistently held:
“Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent’s custody would be in the best interests of the child. M.H.S. v. State Dep’t of Human Resources, 636 So.2d 419 (Ala.Civ. App.1994).
“ ‘The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala.Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala.Code 1975. If the children are not in the physical custody of their parent or *75 parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26 — 18—7(b), Ala.Code 1975.’
“M.H.S. v. State Dep’t of Human Resources, 636 So.2d at 421.
“Where a nonparent petitions to terminate a parent’s parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). The trial court must first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the trial court’s determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep’t of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id.”
A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App.1997).
The evidence indicates that the mother has a long history of substance abuse. After she gave birth to G.A.R.J. and L.D.R., both the children and the mother tested positive for cocaine. DHR presented the mother with numerous outpatient and inpatient treatment program opportunities to combat her drug addiction. With the exception of a 28-day inpatient drug-treatment program the mother successfully completed in June 2001 at A Woman’s Place in Tuscaloosa, the mother failed to complete the numerous other drug-treatment programs DHR recommended she complete. The mother was consistently unwilling or unable to comply with DHR’s numerous drug-screen requests, including the last request made on April 17, 2002, 12 days before the final hearing.
The mother testified that the father occasionally lives in her apartment. The father testified that he has not yet moved out of the mother’s apartment. The evidence reveals that the father continues to use cocaine and tested positive for cocaine use on April 4, 2002, following a test administered during a court hearing. It is clear from the record that the mother and father are pursuing a long-term relationship in which both continue to use drugs. Neither the mother nor the father expressed a willingness to separate from each other or to end their drug use.
The record indicates that DHR was unable to find a. suitable family placement for the children. Indeed, the mother’s sister and her niece failed to follow DHR’s safety plan by allowing the mother to have unsupervised visitation with G.A.R.J. The trial court found that the mother was unwilling and unable to provide for the children’s needs and that there were no viable alternatives to the termination of the mother’s parental rights. Given the evidence in the record on appeal this court cannot say that the trial court’s termination of the mother’s parental rights was plainly or palpable wrong. See A.R.E. v. E.S.W., supra.
The mother also contends that the trial court erred by allowing Moore to submit into evidence certain speculation and conclusions through the admission of her “Permanent Custody Hearing Court Report” and addendum (hereinafter collectively referred to as “court reports”). Specifically, the mother objects to the ad *76 mission of portions of the court reports including (1) the inclusion of a drug-screen report containing the words “diluted specimen”; (2) language indicating she violated DHR safety plans and that her work history was poor; and (3) the indication that she had negative effects on G.A.R.J. when visiting with him.
In support of her contention, the mother cites Rule 701, Ala. R. Evid., which states:
“[I]f the witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.”
The mother argues that the opinions and conclusions Moore sets forth in the court reports are not rationally based on Moore’s perception and that they are not helpful to a clear understanding of Moore’s testimony or the determination of a fact in issue. Our review of the record reveals otherwise.
The record indicates that Moore worked with the mother for approximately three years. In that time, Moore issued approximately 27 drug-screen requests to the mother and was aware of the mother’s struggle with her drug addiction. In addition, Moore observed the mother’s unwillingness and inability to find stable employment; instead, she relied on Social Security income for her daughter and loan disbursements for school as income. On two occasions, Moore testified, the mother violated safety plans instituted by DHR pending the mother’s successful completion of her drug treatment programs. Moore also noted in her report that the foster parents observed G.A.R.J. display violent and negative behaviors after visiting with the mother. Rule 45, Ala. R.App. P., provides, in pertinent part:
“No judgment may be reversed or set aside ... for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
The evidence before the trial court revealed that the mother had an ongoing problem with drug abuse. As a result, G.A.R.J. and L.D.R. were born with cocaine in their systems. DHR removed the children from the mother’s care and attempted to rehabilitate the mother through drug treatment and counseling. Evidence indicated that the mother was unwilling to follow through with outpatient treatment; she was eventually terminated from treatment each time for noncompliance. The mother also demonstrated an inability to complete inpatient treatment, with the exception of a 28-day inpatient treatment program she completed in June 2001. The record indicates that the mother was unable comply with numerous requests by DHR to complete a drug screen.
In addition, the record revealed that the mother continued to live with the father, who also abused drugs. The father testified that he had not moved out of the mother’s apartment. Both the mother and the father shared similar results during the months that DHR ordered them to report to Quest Diagnostics for testing. In June 2001 and July 2001, both the mother and father tested negative for cocaine use. Between August 2001 and March 2002, the mother and father failed to comply with DHR’s drug-screen requests; however, the mother did comply in February 2002, and she tested positive for cocaine use. It is clear from the record on appeal that as long as the mother and the father continue to reside together and pur *77 sue a relationship, drug treatment will fail. The father last tested positive on April 4, 2002. After a thorough review of the record on appeal, this court finds any possible error to be harmless in light of the longstanding history and overwhelming evidence of the mother’s drug abuse and her unwillingness or inability to complete a drug-treatment program and stay drug free.
AFFIRMED.
CRAWLEY and PITTMAN, JJ., concur.
YATES, P.J., and MURDOCK, J., concur in the result.

. We note that the mother informed DHR that she was still legally married to M.D.C. and had been married to M.D.C. since November 21, 1990.

. The record on appeal does not reveal who fathered the two daughters.

. We note that it appears from the court report that the mother was incarcerated for failure to appear.