M.E.P. ("the father") and F.C.P. ("the mother") are the parents of three children, A.M.P., M.T.P., and C.L.P. On December 3, 2004, the parents were arrested at a drug raid, incarcerated in the Talladega County jail, and charged with possession of methamphetamine. The Talladega County Department of Human Resources ("DHR") took custody of two of the children that day based upon emergency dependency petitions. The third child was in Georgia with an aunt at the time; the aunt returned the child to Alabama at DHR's request. All three children were found dependent and placed in DHR's custody.
DHR moved to terminate the parents' parental rights in November 2005. After a trial in October 2006, the trial court entered a judgment declining to terminate the parents' parental rights on the basis that DHR had not presented clear and convincing evidence that the parents' circumstances were unlikely to change in the foreseeable future and stating that, in the court's opinion, termination of the parents' rights at the present time was not in the best interest of the children. After its postjudgment motion was denied, DHR appealed, arguing that the trial court had erred by not terminating the parental rights of both parents.
 "In order to terminate parental rights, the trial court must find by clear and convincing evidence that the child is dependent and that an alternative less drastic than termination of parental rights is not available. Ala. Code 1975, §§ 12-15-65(e), 26-18-1
to 26-18-10; Ex parte Beasley, 564 So.2d 950, 952 (Ala. 1990). `The trial court's decision in proceedings to terminate parental rights is presumed to be correct when the decision *Page 372 
is based upon ore tenus evidence, and such a decision based upon such evidence will be set aside only if the record shows it to be plainly and palpably wrong.' Ex parte State Dep't of Human Res., 624 So.2d 589, 593 (Ala. 1993). `This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility.' Ex parte Farm, 810 So.2d 631, 633 (Ala. 2001). However, the party seeking to terminate parental rights has the burden to present clear and convincing evidence showing that the parent is not capable or is unwilling to discharge his or her parental responsibilities and that there are no viable alternatives to terminating parental rights. Ex parte Ogle, 516 So.2d 243, 247 (Ala. 1987); see also K.W. v. J.G., 856 So.2d 859, 874
(Ala.Civ.App. 2003) (holding that the party seeking to terminate the parental rights of another bears the burden of proving that termination of those rights is the appropriate remedy).
 ". . . .
 "When deciding whether to terminate parental rights, `the primary focus of a court . . . is to protect the welfare of children and at the same time to protect the rights of their parents.' Ex parte Beasley, 564 So.2d 950, 952 (Ala. 1990). Thus, `a court should terminate parental rights only in the most egregious of circumstances.' Id. Beasley set forth a two-pronged test that must be applied in terminating an individual's parental rights. First, unless the petitioner is a parent of the child, the court must make a `finding of dependency.' 564 So.2d at 954. For a finding of dependency, the court must consider whether there are grounds for terminating the parental rights, including but not limited to the grounds specified in § 26-18-7. 564 So.2d at 954. After making a finding of dependency, the court must ensure that `all viable alternatives to a termination of parental rights have been considered.' 564 So.2d at 954.
 "`Once the court has complied with this two-prong test — that is, once it has determined that the petitioner has met the statutory burden of proof and that, having considered and rejected other alternatives, a termination of parental rights is in the best interest of the child — it can order the termination of parental rights.'
 "564 So.2d at 954-55."
Ex parte T.V., 971 So.2d 1, 4-5 (Ala. 2007) (footnote omitted).
The statutory grounds upon which a juvenile court may terminate parental rights are set out in Ala. Code 1975, § 26-18-7. In part, the statute provides that termination of parental rights is an option when "the parents of [the] child are unable or unwilling to discharge their responsibilities to and for the child . . . and such conduct or condition is unlikely to change in the foreseeable future." Ala. Code 1975, § 26-18-7(a). Subsections 26-18-7(a)(1) and (b)(1)-(4) list factors a juvenile court must consider in making the difficult decision to terminate parental rights. Among those factors are a parent's "[c]onviction of and imprisonment for a felony," § 26-18-7(a)(4), that "reasonable efforts by [DHR] . . . leading toward the rehabilitation of the parents have failed," § 26-18-7(a)(6), and, when the child is no longer in the custody of the parents, the "[l]ack of effort by the parent[s] to adjust [their] circumstances to meet the needs of the child in accordance with agreements reached . . . with [DHR]," § 26-18-7(b)(4). In addition, the court may consider a parent's "excessive use of . . . controlled substances, of such duration or nature as to *Page 373 
render the parent unable to care for needs of the child." § 26-18-7(a)(2).
At trial, DHR presented the testimony of Ashley Cooper, the DHR caseworker assigned to the family. Cooper testified that she had offered services to the parents to no avail. According to Cooper, DHR offered supervised visitation, transportation, drug assessment, psychological evaluations, and counseling to the parents. Cooper noted that the parents lived in Georgia for a part of the time the children were in DHR's care; she did not specify exactly when the parents resided in Georgia. The father, who was present for the termination trial, testified that he and the mother moved to Georgia for a three-month period beginning in March 2005.
Cooper said that she explained to the mother what was required to secure the return of the children upon the mother's release from jail in January 2005; she did not mention any conversation with the father. However, Cooper did testify that the parents had attended Individualized Service Plan ("ISP") meetings, at which the services being offered by DHR were discussed. Cooper indicated that DHR had attempted to set up drug assessments for the parents; she said that the father had met once with Patsy Isabell, the DHR drug counselor, but that the mother had not. However, the mother, who was present at the termination trial, testified that she had met once with Isabell in August 2005, approximately one month before she was incarcerated for a second time in September 2005. The father testified that Cooper had not tried to set up the drug assessment or mention other services until the month before his second arrest in November or December 2005. Cooper did not further explain what counseling DHR had sought to offer the parents or what psychological evaluations the parents had failed to complete, nor did she name any counselors or psychologists to whom the parents were referred.
Cooper testified that she had contacted all four relatives the parents had provided as potential resources. Although all four expressed a desire to take custody of the children, Cooper said that only one had taken the initiative to file a petition for custody. The relative that had done so, T.A., the father's sister, withdrew her petition in September 2006.
As noted above, the mother was incarcerated through the month of December 2004. The mother made bond and was released in January 2005. She visited with the children at that time. The mother attended 14 of the 18 scheduled visitations with the children. The mother was also subjected to random drug tests at certain visitations; although the mother's first drug test was negative, the mother tested positive for methamphetamine on four occasions: once in May 2005, twice in August 2005, and once in September 2005. The mother also tested positive for marijuana on one of those occasions and she tested positive for amphetamine on two others. She missed at least three requested drug tests that DHR had scheduled in June and July 2005.
The father was released from jail in March 2005 after spending three months in jail. He tested positive for methamphetamine on both of the drug tests that he took in August and September 2005; he also tested positive for cocaine on both tests and positive for marijuana on the September test. The father, like the mother, missed three drug tests in June and July 2005; in addition, he missed a drug test in May 2005. Although it is clear from a reading of the record that the father missed many scheduled visitations, the actual number of visits the father attended is not clear. The father did say that he was working at the time of many *Page 374 
scheduled visitations and that he needed to work in order to pay the attorney fees, fines, and court costs arising from his December 2004 arrest.
The mother was arrested on a second drug charge in August or September 2005 arising from her possession of two "pills" in Calhoun County. Ultimately, she was sentenced to five years in prison on the possession-of-methamphetamine charge arising in Talladega County and to two years in prison on the possession charges arising out of each of the two pills she possessed in Calhoun County. The father was again arrested for possession of methamphetamine in November or December 2005. He was ultimately sentenced to 10 years in prison on the methamphetamine charges arising in Talladega County and to 2 years in prison on the methamphetamine charges arising in Calhoun County.
The mother was incarcerated in the Calhoun County jail until April 2006, when she was transferred to Julia Tutwiler Prison ("Tutwiler"). The mother did not attend any drug-rehabilitation programs while she was incarcerated at Tutwiler. The mother was transferred to a work-release facility in Birmingham in September 2006, where the mother had just begun working as a housekeeper in a motel shortly before the termination trial. The mother indicated that the housekeeping job would be available to her after her release and that the motel would allow her to transfer to a location closer to where she lived; according to the mother, she planned to try to find an inexpensive trailer to rent or to move to Georgia to live with one of the father's sisters upon her release. The mother was scheduled to be released on May 18, 2007.
The father was incarcerated in Draper Correctional Facility ("Draper"). While at Draper, the father completed the SAP program, a drug-treatment program offered by the Department of Corrections. The father also completed an anger-management course, a self-concept class, and three other self-improvement classes offered at Draper. The father explained that he had enrolled in the SAP program and the other classes because he had realized that he was addicted to methamphetamine and that he needed help to overcome the addiction; he stated that being in prison had actually made him a better person. In addition to his taking advantage of the drug-rehabilitation and self-improvement classes at Draper, the father had begun working toward his auto-body-repair certificate. He explained that he would be able to transfer his credits toward this certificate to a trade school or junior college upon his release so that he could complete his education. The father testified that he would be eligible for parole consideration in August 2007. The father was scheduled to be released on December 15, 2008.
DHR argues on appeal that the trial court abused its discretion when it determined that DHR had not presented clear and convincing evidence that the parents' condition was not likely to change in the foreseeable future and that termination of the parents' parental rights was not in the children's best interest. As DHR points out, this court has often stated that there is a point at which the child's need for permanency and stability will overcome the parent's rights to rehabilitation by DHR. M.W. v. Houston County Dep't of Human Res.,773 So.2d 484, 487 (Ala.Civ.App. 2000). The point at which the child's needs overcome the parent's right to be rehabilitated must be determined based on the facts of each individual case.
DHR notes that, even if the mother were released in May 2007, she would first need to find (or continue, if the housekeeping *Page 375 
job were transferable) stable employment and establish a suitable residence; DHR correctly observes that it could not place the children with her without first having her demonstrate the ability to provide for both herself and the children. The mother never worked before her incarceration, and she has never had to provide for herself, let alone a family of four. Even if the father were able to secure release from prison in August 2007 and join the mother, he, too, would have to prove his ability to find and maintain stable employment, secure a suitable residence for the family, and provide sufficient income for the family.
The largest hurdle, by far, is the parents' admitted addictions to methamphetamine, a highly addictive drug. Although the father has completed drug rehabilitation in prison, his ability to remain drug free has not been tested outside of prison. The mother, unlike the father, has not completed drug rehabilitation, and she, too, has not shown an ability to remain drug free outside of the prison environment. The mother admitted at trial that she came to visits with the children while on methamphetamine despite the fact that she knew she could be tested by DHR. Neither parent was able to remain drug free, even while the custody of their children hung in the balance and they faced charges stemming from their possession of methamphetamine. In fact, the parents made no effort to overcome their addiction at all in 2005. Thus, even if the parents are released in the summer of 2007, the children will remain in foster care for at least several months, and more likely close to a year, before the parents could possibly be permitted to resume custody. The children deserve to have a stable custody arrangement before 2008, having spent, at present, approximately two and one-half years in foster care.
Although we agree that the parents might well have demonstrated that they have some ability, and a desire, to change upon their respective releases from prison, we cannot agree with the trial court's conclusion that DHR failed to present clear and convincing evidence that the condition resulting in the parents' inability to care for their children would not change in the foreseeable future. The father's release date is uncertain, and the mother's ability to secure and maintain employment and a suitable residence while remaining drug free is untested. Likewise, we cannot agree that DHR did not establish that termination of the parental rights of both parents was not in the best interest of these children, who deserve a permanent placement instead of continued foster placement for a year or more while awaiting their parents' possible, but not certain, rehabilitation.
REVERSED AND REMANDED.
PITTMAN and BRYAN, JJ., concur.
THOMPSON, P.J., and MOORE, J., dissent, without opinion.