PITTMAN, Judge.
This appeal arises out of the juvenile court’s decision to issue an order terminating the parental rights of the mother, D.Y.G. (hereinafter “the mother”), to her two minor children, S.V. and M.V. The sole issue raised on appeal is whether the trial court’s order terminating the mother’s parental rights is supported by clear and convincing evidence. We affirm the decision of the trial court.
In September 1997 the Madison County Department of Human Resources (hereinafter “DHR”) filed a petition with the juvenile court, alleging dependency of the mother’s two children. The petition alleged that the mother instituted bizarre and unusual punishment against the children. A shelter-care hearing was held before a referee, who recommended that shelter-care custody of both children be placed with DHR and that physical custody of S.V. be placed with her biological father, M.L. The juvenile court upheld these recommendations. In December 1997, amid allegations of physical abuse of S.V. by M.L., DHR filed a motion for a shelter-care hearing; the hearing was held before a referee, who recommended that physical custody of S.V. be removed from M.L. and transferred to DHR. The juvenile court upheld the referee’s recommendations. In April 1998 a hearing on temporary legal custody of both children was held, and both were declared by the juvenile court to be dependent. In July 1998, October 1998, and March 1999, dispositional hearings were held. Each time the juvenile court determined that the children should remain dependent. In February 2000, DHR filed a petition requesting termination of the mother’s parental rights to both children, and, in January 2001, the juvenile court issued an order terminating the parental rights of the mother and placing permanent custody of both children with DHR. The mother now appeals.
“The termination of parental rights is a drastic measure, and the courts gravely consider such action. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). A natural parent’s prima facie right to the custody of his or her child is outweighed only by clear and convincing evidence indicating that termination of parental rights is in the best interests of the child. L.N. v. State Dep’t of Human Resources, 619 So.2d 928, 929 (Ala.Civ.App.1993). The juvenile court considers the parent’s physical, financial, and mental abilities to care for the child, to determine the child’s best interests. J.L.B. v. State Dep’t of Human Resources, 608 So.2d 1367, 1368 (Ala.Civ.App.1992).
“The grounds upon which a court may terminate parental rights are set out in Ala.Code 1975, § 26-18-7(a):
“ ‘[T]he parents of [the] child are unable or unwilling to discharge their responsibilities to and for the child, or ... the conduct or condition of the parents is such as to render them unable to properly care for the child and ... such conduct or condition is *642 unlikely to change in the foreseeable future.... ’
“The juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) whether there are any viable alternatives to a termination of parental rights. Beasley, at 954.”
M.W. v. State Dep’t of Human Resources, 761 So.2d 246 (Ala.Civ.App.1999.) A trial court’s decision to terminate parental rights based on ore tenus evidence is presumed correct and will be reversed only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. R.B. v. State Dep’t of Human Resources, 669 So.2d 187 (Ala.Civ.App.1995).
As an initial matter we note that DHR properly points out in its brief on appeal that the mother is precluded from appealing the juvenile court’s determination of the children’s dependency because that determination was made in April 1998 when the juvenile court placed temporary legal custody of the children with DHR and no appeal was taken of that order. See M.C. v. K.M., 788 So.2d 166, 169 (Ala.Civ.App.1999). Because no appeals from those orders were timely filed, we are precluded from reviewing on appeal the juvenile court’s determinations as to the dependency of the children. Thus, the only reviewable issue on appeal is whether the juvenile court erred in determining that there were no viable alternatives to a termination of parental rights. M.W., supra, quoting Beasley.
Our review of the record indicates that the juvenile court did not err in terminating the mother’s parental rights because the evidence presented reveals clear and convincing evidence indicating that termination of her rights is in the best interests of the children. See L.N., supra. Carolyn Harris, the DHR supervisor assigned to this case, testified on the basis of DHR records that both of the mother’s children are minors; S.V. was born in 1993 and M.V. was born in 1995. She stated that DHR was first notified of an allegation of inadequate supervision in the mother’s home in 1995, roughly two weeks after M.V. was born. Upon this report DHR offered and successfully provided homemaker services to the mother. In April 1997 DHR received another report of inadequate supervision occurring in the mother’s home. Harris testified that upon investigation DHR discovered the allegations to be true, and discovered bizarre and unusual punishment being inflicted on the children — the mother would leave the children locked, strapped, or tied down in car seats in the middle of the living room of her house for extended periods (i.e., while the children were watching television) and she would scream and curse at the children. Harris stated that when the mother was questioned by a social worker as to why she secured the children in the car seats in such a manner, the mother answered that she wanted to make sure that the children were learning something from the television programs (such as “Barney” and “Oscar”) that they were watching. The mother also told the social worker that she let them out of the car seats to go play in their playroom.
Harris testified that DHR offered the mother homemaker and protective services, assistance with mental health services, and family options. During a followup visit in September 1997 in which DHR again offered the mother these services, she refused, and DHR, concerned for the safety of the children, removed them from her custody. Harris stated that a shelter-care hearing was conducted and that the children were placed in the custody of DHR. S.V. was subsequently placed with her natural father, M.L. M.V.’s natural *643 father, M.M., did not make himself available to receive placement of M.V. with him. After DHR received reports of physical abuse by M.L. upon S.V., S.V. was placed in foster care in the same residence where M.V. had been placed.
Harris testified that although the mother attended individualized service plan (ISP) meetings conducted by DHR in regard to providing care and reviewing the cases of the children, who through the time of trial remained in DHR’s custody, the mother did not attend the last of these meetings. She stated that pursuant to the ISP, DHR offered services to the mother since 1997 with the intent to effectuate a reconciliation with the children. Harris stated that initially the mother visited with the children twice a week, but since the termination petition was filed and the children’s foster parents reported that the visits appeared to be upsetting the children, visits were decreased to once a week. However, she also stated that the mother had been diligent in attending the visitation sessions. When asked how the mother acted during these visits, Harris testified that “it [had been] reported” that the mother usually first checked the children for bruises and cuts to see if they have been harmed while in care of the foster parents; Harris also stated that the mother is usually “extremely critical” of the children, complains about their clothes and appearance, and often complains that S.V. exhibits “an attitude.” Harris testified that during these visits it appears that the mother has a good relationship with M.V., but S.V. appears confused and often does things to get the mother’s attention.
Harris also testified that the foster parents and officials from the children’s school have reported that the children exhibit behavioral problems after the visits. Harris elaborated that S.V. appears to be extremely hyperactive, exhibits disruptive behavior at school, constantly seeks reassurance from the foster mother that she is loved and that she-is pretty, while M.V. would sometimes vomit when it was time for him to visit with the mother. When Harris was asked if S.V.’s disruptive behavior was solely attributable to her visits with her mother, Harris answered that she believes that'the visits with the mother contribute to the problem. Harris also testified that although the children have been in good health since their placement with DHR, when they were first taken from the mother, S.V., four years old at the time, was not toilet-trained and was undergoing counseling from mental health authorities. Harris stated that although the mother expressed to DHR a concern with putting S.V. on Ritalin because she feared that S.V. would lose weight and die, the therapist at the mental health center stated that the mother had actually recommended that S.V. be prescribed Ritalin in order to calm her down. The therapist also told Harris that S.V. needed speech therapy, but that the mother had not sought such services, as had been recommended to her. Harris testified that she had been informed of incidents during visits where the mother was observed attempting to put M.V. in “time-out,” but that M.V. hit the mother, who responded by hitting M.V. When M.V. bit her, she bit him back, leaving an impression of her teeth in his arm and saying, “[t]his should stop him from biting.” On another occasion the mother “engaged in another hitting match” with M.V. and directed him to go hit a tree until he calmed down.
Harris testified that although the mother, at the time DHR became involved in this case, was already involved with mental health authorities,[1] DHR referred her to a local psychiatrist who observed her and *644 noted that because of her developmental history (which the psychiatrist described as being characterized by “disorganized experiences”) he would recommend that she receive continuing supervision to care for her children. Harris stated that the psychiatrist also noted that given the mother’s disorganized parenting style, it would be unlikely that her method would ever change. Harris testified that another psychiatrist observed the mother and he noted that her judgment was questionable, her level of insight was poor, and that her lack of willingness to engage in a meaningful therapeutic process indicates that her prognosis for treatment would be unfavorable. In December 1998 DHR completed a Parental Functional Assessment (“PFA”) of the mother, which indicated that although she appears to be a pleasant woman who cares for her children, she also exhibits educational deficits, reported mental disability, lack of social maturity, and a poor state of physical health (including asthma, upper respiratory problems, and Attention Deficit Hyperactivity Disorder), all of which would have a negative impact on her parenting abilities. Harris also stated that the PFA indicated that the mother has not been receptive to treatment initiatives and she greatly depends on others to care for her.
Harris testified that to the best of her knowledge, the mother was not employed at the time of trial, nor had she been employed for a majority of her life. At the time of trial the mother was 29 years old. Harris stated that DHR gives some consideration to the caregiver’s financial ability to care for children and that the mother, in this case, receives Social Security benefits in the amount of $521 per month. Although the mother has not provided financial support to DHR while it maintained custody of the children, Harris stated that the mother has brought toys and clothes to the children. The natural fathers of the children have provided no financial or other support while the children have been in DHR’s custody, nor have they participated in visitation with the children. Harris testified that since being placed in a foster home, the children appear to be doing well and are both enrolled in school programs. Harris stated that despite DHR’s efforts to locate relatives with whom the children might be placed, she has located none. Harris stated that the mother also gave birth to another daughter (who is also subject to this petition for custody) who has been placed with her paternal grandparents in Tennessee. Harris testified that on the cumulative basis of the clinical assessments and reports offered by those who had observed the mother for three years, she recommends that her parental rights to S.V. and M.V. be terminated.
Gigi Todd, who provides homemaker services and counseling for DHR, testified that the mother first exhibited a spirit of cooperation with homemaker services, followed by a lack of cooperation. The mother cancelled some meetings, saying that she did not need DHR’s additional assistance. Todd also stated that the mother’s parenting skills had improved during the times when Todd would visit, but that she had also been told by other social workers who had observed the mother that she would not exhibit those same skills in their company. Todd testified that the mother was more interactive with M.V. than with S.V. She also stated that at times S.V. appeared to want to please the mother by dressing up for her visits, but when the mother expressed disapproval, it would sadden S.V. Todd testified that on occasion the mother would compliment her children, which showed some improvement in her ability to relate to them. She also testified that the mother has a clear idea of what is important to her and her children, as well as a clear idea of dangerous situations involving the children she should avoid. Todd stated that based on her observance *645 of the mother, as long as there is an orderly routine, the mother parents well, but Todd expressed her concern about the mother’s parenting skills when something unanticipated happens. She testified that she was present when the “bite fight” between M.V. and the mother took place, and she expressed concern that the mother never explained to M.V. what exactly he did wrong. Todd stated that despite her having worked to rehabilitate the mother’s parenting skills over the course of three years, she did not believe that without supervision or help the mother’s skills would ever improve to a point where she would feel comfortable letting the mother have custody of the children. She explained that she based her opinion on both her observance of the mother’s parental skills in regard to her own children, as well as information the mother told her about how she handled other people’s children (in a manner Todd thought inappropriate).
The mother testified that she once placed the children in their car seats when she was cleaning the floors of the house, but denied that she ever placed them in the car seats any other time. She also admitted to biting M.V. She testified that as of the time of trial she was married and living with her husband. Although he is employed, she is not,[2] she can only read and write “some,” and she receives food stamps and Social Security benefits because of her diagnosed attention deficit disorder[3] (“ADD”). She testified that her income is sufficient to meet her expenses, but that if she were awarded custody of the children, she would get a part-time job (despite the fact that she has not worked in over 10 years). She stated that it was difficult to keep a job for any period, given her diagnosis of ADD. The mother testified that she did not always agree with the methods of raising her children that Todd had attempted to teach her. She stated that she has complied with everything DHR instructed her to do and that there was no reason that she could not care for her own children. The mother stated that when the children were in her care, she saw to it that they were safe and properly fed. However, she admitted that despite her asthma, she smoked during all three pregnancies — up to three packs a day when she was pregnant with her third child. When asked if she had learned anything through the services provided by DHR, the mother answered that she learned that you have to watch what you say around DHR and jump through hoops around DHR. When the attorney clarified his question and asked if she had learned any specific homemaking or parenting services from DHR that she did not previously know, she answered that she had not.
Charlene Peace, the mother’s sister, testified that although she thought that the mother was adequately able to clean, cook, and raise the children, she contacted DHR because in caring for the children the mother was neglecting her own health. Peace stated that on occasion she had witnessed S.V. sitting herself in the car seat to watch cartoons. She also explained that S.V. knows how to strap herself into the car seat.
In consideration of the presumption we are to afford the trial court’s determination upon ore tenus testimony, we conclude that the record reveals that the trial court did not err in determining that there is clear and convincing evidence that termination of the mother’s parental rights is in *646 the best interest of the children. See R.B., supra; see also M.W., supra, quoting L.N. The mother suffers from various respiratory ailments and ADD, which she admits inhibit her ability to maintain a job. Although she asserts that her income covers her expenses sufficiently, that income would only be strained more if she is granted custody of her two children, and her promise to get a job to support the children is implausible, given the fact that she cannot currently maintain a job. See M.W., supra, citing J.L.B. We determine the mother’s contention that the trial court made its decision to terminate her rights solely on the basis of her financial inabilities is without merit, given the fact that Harris testified that the financial ability of the parent is only one of several factors considered in DHR’s analysis. More importantly, both the DHR worker who personally observed the mother interact with the children and her case supervisor, as well as mental health counselors from whom she has either sought assistance or who have had occasion to observe her, all testified that given the methods she uses to care for the children and the little progress she has made towards improving those methods, she cannot adequately care for her children currently, and, given her learning curve and obstinance, there is little hope that this condition will improve. See M.W., supra, quoting § 26-18-7(a). Furthermore, Harris testified that S.V.’s father physically abused S.V. when she was placed with him, M.V.’s father has not been in contact with DHR, and she has been unable to locate any relative who might be able to provide a viable alternative placement for the children. See M.W., supra, citing Beasley. Thus, the record does not reveal that the trial court’s decision to terminate the mother’s parental rights is unsupported by the evidence or plainly and palpably wrong. See R.B., supra.
AFFIRMED.
THOMPSON, J., concurs.
MURDOCK, J., concurs in the result.
YATES, P.J., and CRAWLEY, J., dissent.

. Harris testified that the mother, on her own accord, informed her that she had not attended her mental health counseling sessions for some time prior to trial.

. The mother testified that she was educated in special education classes and remained in school through the eighth grade.

. We note that the trial transcript contained in the record reflects that testimony was received that indicated that the mother was diagnosed with Attention Deficit Disorder and Attention Deficit Hyperactivity Disorder.