PITTMAN, Judge.
S.F. (“the mother”) and R.W. (“the father”) appeal a trial court’s order terminating their parental rights as to each of their three children, D.W., Sh.W., and S.W. In May 2000 the Department of Human Resources (“DHR”) filed petitions to terminate the parental rights of the mother and the father as to the three children. On April 24, 2002, and May 7, 2002, the trial court held a hearing on those petitions. At the time of the hearing, the children were seven, six, and three and one-half years old.
Tami Chancy, a licensed professional counselor, testified at the hearing. Chancy stated that she had counseled two of the children, D.W. and Sh.W., for a year and a half. Chancy described the significant positive behavioral changes she had seen since the children were placed in foster care. Chancy testified that the two children were hyperactive, but that a combination of medication and structure provided by the foster parents had helped the two children concentrate better and behave better in school and in public. Chancy stated that after her first two or three visits with the children, neither of them had mentioned their natural father during counseling sessions.
Tony Webber, a Houston County probation officer, testified that he had known the mother since April 2001. He described the community corrections program that the mother was enrolled in that required her to cooperate completely with DHR; to violate no federal, state, or local laws; to find and maintain suitable employment; to refrain from changing residences without prior permission; and to pay a supervision fee of $25 per month for the duration of her probation.[1] Webber testified that the mother had not maintained any stable employment during her probation, that she had moved without permission, and that she had not paid any supervision fees since October 2001. Web-ber stated that he had seen no improvement in the mother’s ability to handle responsibility in the year preceding the hearing. Webber also stated that if the mother had not been pregnant at the time of the hearing, the Houston County probation office would have revoked her probation.
Linda Thomas, a staff member of Family Options, an independent agency providing intensive on-site intervention to help families in crisis, testified that DHR had referred the mother to Family Options for services nearly three months before the hearing in reference to the mother’s then nine-month-old child, D.F.[2] Thomas stated that she visited the mother’s house and observed filthy conditions that she thought made the house unsafe for a nine-month-old baby. Thomas noticed that the sink was piled with dirty dishes, that clothing was strewn all over the floor, that the bathroom was filthy, and that the baby’s high chair was encrusted with dried food. Thomas concluded by stating that she saw no reason why either the mother or her then husband (not the father) could not perform basic housework to keep the house clean and safe for a child.
*101 On cross-examination, Thomas stated that, although Family Options is a four-week intervention program, a coworker and she had made a total of five weekly visits to the mother’s house. Thomas noted that she had personally visited the mother’s house four times, but the mother was not at home on two of those occasions. Thomas stated that she and the mother had developed some goals, but that the mother had not changed her habits.
Jennifer Magrino, the DHR caseworker for the three children, received the case in May 2000, at the same time the children were taken into custody by DHR. Magrino stated that DHR had held 19 meetings to develop Individual Service Plans (“ISPs”) to aid the father and the mother in regaining custody of their children. She testified that the father had attended nine of those meetings. Magrino stated that she discussed with the father the termination procedure and the father’s right to an attorney. According to Magrino, the father initially stated that he believed foster care was best for the children. Magrino did not recall the father’s asking for custody of the children at any time during the year preceding the hearing. Furthermore, she stated that none of the father’s relatives had been identified as suitable alternatives to raise the three children.
Magrino testified that before May 2000 DHR had received 22 indicated reports that the care of the children was inadequate. She also testified concerning the following matters: The father had left the house in February 2000, before DHR took custody of the children. The mother had moved eight times since the children were taken into DHR’s custody. DHR provided numerous services to the mother to help her regain custody of the children, including transportation services, financial aid, homemaker services, employment referrals, counseling services, and parenting classes. The mother has not been able to maintain employment for any length of time; at the time of the hearing she was working part-time for minimum wage. Magrino concluded that the mother had made some lifestyle changes, but had not been able to maintain those changes for any length of time. Magrino cited, as an example, that the mother had found work, but had been unable to keep a steady job. Magrino also noted that the mother was able to clean her home, but had failed to maintain the cleanliness. Magrino did not foresee either the mother or the father making the changes necessary to regain custody of the children in the near future.
Magrino noted that DHR intervened about one month before the hearing and had removed a fourth child, D.F., due to inadequate supervision and neglect. Mag-rino testified that the mother was pregnant at the time of the hearing and that her fifth baby was due in June 2002. Magrino testified that the mother had recommended her two half sisters, A.W. and H.O., for alternative placement. Magrino stated that A.W.’s home evaluation revealed that that sister already had two children of her own and that her husband had been arrested for possession of a controlled substance. The evaluation further noted that A.W. had an indicated-neglect report concerning her child, as well as an arrearage in child support for a child not in her custody. According to Magrino, DHR attempted to perform a home evaluation of H.O., but a vacant lot was at the address DHR had been given, and DHR could not verify H.O.’s address. Magrino stated that the mother later indicated that she did not want her children left with H.O. because she feared they would be abused.
During cross-examination, Magrino stated that she believed that the mother loved her children. She also testified that at the *102 time of the hearing DHR was working with the mother to develop an ISP to regain custody of the fourth child because the child had been removed from the mother’s custody only one month before the hearing. Magrino stated that because the three older children had been in foster care for 28 months, she believed the children needed a permanent home as soon as possible.
On the second day of the hearing, Mag-rino testified that the father had never asked to be considered by DHR as an alternative placement for the children. Magrino stated that the father’s mother had initially been reviewed as a candidate for alternative placement of the children, but her health was too poor to allow her to be considered. Magrino reviewed the latest ISP for the father, stating that it showed that the father loved the children, that he was responsive to them, that he was willing to accept assistance, and that he was employed. Magrino also stated that the fact that although the children had improved while in foster care, those improvements did not solve the problems that originally required DHR to remove them from the mother.
Magrino also stated that she received a report from Dr. Roby Hicks who had diagnosed the mother with adjustment disorder with depressed moods resulting in parent/child relational problems, partner relational problems, and occupational problems. Dr. Hicks’s report included a statement that the mother had had suicidal thoughts but that she had not acted on them because the mother believed an unsuccessful suicide attempt would prevent her from getting custody of her children.
The trial court asked Magrino about referring the mother to Family Options in May 2000. Magrino agreed that Family Options had not succeeded in helping the mother keep custody of her children. Magrino stated that she had seen the mother keep a clean and safe environment for a time, but that the living environment would deteriorate; on occasion, she had seen animal feces on the floors and other similar unsanitary conditions. Magrino also testified to the following matters: During the two years before the hearing, DHR had received reports that the children were playing naked in the neighborhood, reports of domestic violence in the home, and reports of the mother’s striking the children. Furthermore, DHR did not have a current address for the father until two weeks before the hearing. The father never requested a home evaluation, and he never paid any child support during the entire time the children had been in foster care.
The mother testified that she had left an abusive relationship with another man, had married again, and was pregnant with her fifth child. The mother stated that she had completed several parenting classes. The mother testified that her new home was a mobile home with three bedrooms and one and one-half baths. The mother brought pictures of her new home, which showed beds for the children, and the safety plugs and doorknob covers that she had purchased. The mother stated that DHR had told her what to do in order to regain custody of her children; she testified that she had tried to do everything DHR had told her to do. The mother discussed all the jobs she had had in the two years before the hearing; she stated that she had lost most of them because of health problems and a lack of transportation. The mother stated that she had been molested while she was a minor and in foster care and that she had had her first two children while she was still in DHR’s custody. The mother related that although she had only a part-time job, she and her new husband jointly earned $1,438 each *103 month; she stated that this money paid all their bills, with some money left over. The mother described a typical overnight visitation, including the amount of time she plays with the children, the amount of time she allows for naps, the amount of time they spend preparing and eating meals, the amount of time the children are allowed to watch television, and the chores each child performs while visiting their mother.
The mother recounted her childhood spent in DHR’s custody and the abusive situations she had lived through. The mother stated that because she loves her children and wants them to have a better childhood than she experienced, she is willing to do whatever DHR says she must to regain and maintain custody of her children. On cross-examination the mother admitted that she had not paid any child support since November 2000. The mother also admitted that she had not had her children for overnight visitation since the previous year and that her description of overnight visitation was merely her plan for future visits. The mother admitted that due to her difficult childhood she still needed counseling.
The father did not testify. The trial court entered a separate order for each child, terminating the mother’s and the father’s rights as to S.W., Sh.W., and D.W. The father and the mother filed timely appeals contesting the termination of their parental rights as to each child.
“ ‘[0]ur standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of a trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court’s discretion is shown.’ ”
Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994)(quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993) (citations omitted)).
The law in Alabama is that parents have a prima facie right to the custody of their child. See Ex parte D.J., 645 So.2d 303 (Ala.1994); Ex parte Terry, 494 So.2d 628 (Ala.1986).
“This prima facie right can be overcome only by clear and convincing evidence that the child’s best interests would be served by removing the child from the parent’s custody. The consideration for the best interests of the child lies at the heart of every proceeding to terminate parental rights.”
M.H.S. v. State Dep’t of Human Res., 636 So.2d 419, 421 (Ala.Civ.App.1994). Also in such a proceeding, the juvenile court must find from clear and convincing evidence that the child is dependent and that there are no viable alternatives to terminating the parental rights. See Ex parte Beasley, 564 So.2d 950 (Ala.1990). The statutes regarding termination of parental rights are codified at §§ 26-18-1 through 26-18-11, Ala.Code 1975.
Section 26-18-7(a) provides, in relevant part:
“If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge *104 their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
“(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child....
“(4) Conviction of and imprisonment for a felony.
“(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
“(6) That reasonable efforts by the [DHR] ... leading toward rehabilitation of the parents have failed.
[[Image here]]
“(8) That parental rights to a sibling of the child have been involuntarily terminated.”
Furthermore, § 26-18-7(b) provides that if, at the time of the termination hearing, the child is not in the custody of the parents, the juvenile court may consider whether the parents are providing monetary support for the child, whether they are regularly exercising visitation with the child, and whether they are adjusting their “circumstances to meet the needs of the child.”
We first address whether the children are dependent. The evidence indicated that before the children were taken from the mother in May 2000, DHR had received 22 indicated reports of inadequate care of the children. DHR offered several types of services to help the mother regain custody of the children including counseling, transportation, financial aid, homemaking services, employment referrals, and parenting classes. However, as recently as six weeks before the hearing, crisis intervention was unable to prevent the mother from losing custody of her fourth child, a nine-month-old baby. The mother has not paid any child support since the previous year nor has she maintained a steady full-time job. The evidence also indicated that the father left the mother in February 2000. DHR did not have an address for the father until less than a month before the hearing and he has never paid any child support. We conclude that the record contains clear and convincing evidence that the children are dependent.
We next review whether the juvenile court properly considered viable alternatives to a termination of the parents’ parental rights and whether it properly rejected those alternatives. While the mother has consistently exercised visitation, she has not paid child support since the year before the hearing, and she has not maintained a steady job or kept a clean home environment. The evidence indicated that the mother had recommended her two half sisters, A.W. and H.O., for alternative placement. The evidence also showed that neither sister was an appropriate candidate for placement for various reasons including the potential for domestic violence and further neglect. In fact, the mother indicated that she did not want her children left with H.O. because she feared the half sister’s father might abuse *105 the children. The evidence indicated that the mother was able to make some lifestyle changes for short periods, but that she was unable to maintain those positive changes over the long term.
Although the father had attended half of the ISP meetings with DHR and had exercised sporadic visitation with the children, he never asked for custody of the children and he never requested a home evaluation. DHR reviewed the father’s mother as a possible candidate for alternative placement but determined that she was not a viable alternative because her health was so poor that she could not manage visits with more than one child at a time. We conclude that the trial court did not err when it determined that there were no viable alternatives to terminating the parental rights of the mother and the father.
Because clear and convincing evidence supports a finding that the children are dependent and because there are no viable alternatives to terminating the parental rights of the mother and the father, we affirm the juvenile court’s judgment terminating the mother and the father’s parental rights.
AFFIRMED.
YATES, P.J., and CRAWLEY and THOMPSON, JJ., concur.
MURDOCK, J., concurs in the result.

. The mother was convicted of two ''NWNI's” in the district court and of second-degree possession of a forged instrument in the circuit court.

. D.F. is not one of the children as to whom DHR is seeking to terminate the mother's parental rights in this action.