On January 24, 2002, the State Department of Human Resources ("DHR") filed an action in the Cullman Juvenile Court ("the trial court") seeking to terminate the parental rights of J.M.O. ("the mother") to C.G.M. ("the daughter"). The mother answered with a general denial of all the allegations set forth in DHR's complaint. On August 19, 2002, the trial court held a hearing and received ore tenus evidence. By an order dated August 27, 2002, the trial court terminated the mother's parental rights.
The trial court heard evidence supporting the following facts at the August 19, 2002, ore tenus hearing. In November 2000, the mother and the daughter arrived at Harbor House, a home for abused women, seeking shelter from the mother's boyfriend, L.C. ("the boyfriend"). Deborah Tucker, the executive director of Victim Services of Cullman, was employed as an assistant at Harbor House. According to Tucker, the mother claimed that she had been beaten by the boyfriend and forced by him to sexually abuse the daughter while he watched and fondled himself. Tucker informed the mother that Harbor House was required to report any instance of abuse to DHR. The mother acknowledged Harbor House's responsibility to report allegations of abuse to DHR, but she continued to implicate herself in the sexual abuse of her daughter.
Harbor House reported the alleged abuse of the mother and the daughter to DHR, which assigned Alicia Jennings, a DHR employee, to conduct the initial interview of the mother. According to Jennings, the mother claimed to have been abused physically and sexually as a child. Jennings testified that the mother's first *Page 176 
child, a son who was born when the mother was 17 years old, was adopted after the mother's parental rights to that child were terminated by the State of Virginia, where she formerly resided. The mother, who was 26 years old at the time of this termination hearing, also reported to Jennings that she had experienced a miscarriage, that she had had a stillborn child, and that she had had a child that died two days after its birth. Jennings stated that the mother reported having used drugs during her other pregnancies, but that the mother stated that she could not remember whether she had used illegal drugs while she was pregnant with the daughter.
During the initial interview with Jennings, the mother identified the boyfriend as the man responsible for abusing her and forcing her to abuse the daughter. Jennings was told by the mother that she had been with the boyfriend since she was 17 years old; the boyfriend was 55 years old at the time of the hearing. The mother told Jennings that the boyfriend had beaten her repeatedly over the course of their relationship. Jennings testified that the mother reported that she was forced by the boyfriend to have group sex with him and other men they had met in bars and that he would often prostitute her to other men. The mother told Jennings that the boyfriend was bisexual and that they had engaged in unorthodox sexual behavior. During meetings that followed the initial interview, the mother repeated to Jennings the allegation that the boyfriend had forced her to sexually abuse the daughter while he watched and fondled himself. Based on the information relayed to Jennings by the mother, Jennings and other DHR staff members decided to take temporary custody of the daughter.
Paige Blackwood, a DHR caseworker, was assigned to design the mother's Individualized Service Plan ("ISP"), to arrange visitation between the mother and the daughter, and to conduct relative-resource identification and home studies. Blackwood testified that the mother attended every scheduled visitation with the daughter and that the mother and daughter bonded and enjoyed one another's company. However, Blackwood expressed concern over the fact that the boyfriend, the man the mother accused of beating her repeatedly, often accompanied her to those visitations. Blackwood stated that, although the mother agreed to attend DHR's parenting class, she never actually attended the classes because she was out of town with the boyfriend. The mother missed two out of her three ISP meetings.
Blackwood performed the search for relatives that could potentially take custody of the daughter based on information provided by the mother. The mother initially listed her half-sister as a relative resource, but she later told Blackwood that the half-sister was an unsuitable choice because she used illegal drugs. The mother also claimed that the half-sister's husband had raped her when she was pregnant with her son. L.C., the mother's relative, was disqualified because her father was married to the mother's biological mother; the maternal grandmother's parental rights to the mother had been terminated years before. The mother's adoptive mother, P.H., declined to take custody of the daughter because of her failing health. The boyfriend's relatives were not considered after a DNA test determined conclusively that he was not the daughter's biological father.
Dr. Louis Pope, a licensed psychologist at Alabama Psychological Service Center, interviewed the mother and performed her psychological evaluation. According to Dr. Pope, the mother spoke with him about her arrests, her depression, and her suicide attempts. Dr. Pope diagnosed the mother with a major depressive disorder *Page 177 
and recommended further testing, which DHR did not authorize him to perform.
At the hearing, the mother denied having been forced by the boyfriend to sexually abuse the daughter. The mother testified that she created the story about being forced to sexually abuse her daughter in an attempt to solicit help from Harbor House. According to the mother's testimony, she grew up in the foster-care system and she knew that the best way to have a restraining order issued against the boyfriend was to report that she and her child were victims of physical and sexual abuse. The mother admitted that she told Jennings, Tucker, and Blackwood that she had sexually abused the daughter at the boyfriend's demand, but she testified that she had lied in order to obtain a restraining order against the boyfriend.
Although the mother testified that she had lied about the daughter's being sexually abused, she continued to assert that the boyfriend had physically abused her, that he had sold her to other men as a prostitute, and that she had been forced to engage in unorthodox sexual behavior with the boyfriend. The mother testified that she finally was able to leave the boyfriend when he checked into an alcohol-rehabilitation clinic. According to the mother, the boyfriend's stay in an alcohol-rehabilitation facility was her first chance to safely leave the boyfriend in the nine years they had known one another. The mother testified that the boyfriend had been able to find her at Harbor House, even though she had been staying there anonymously, and that he had followed her when she left Harbor House to run errands.
The mother's testimony confirmed that her parental rights to her first child, a son, were terminated by the State of Virginia because her living arrangement was determined to be unsuitable for a child. The mother stated that she was 17 years old at the time of the first termination proceeding and that she had not known how to properly care for the son.
The mother testified that the boyfriend was the father of the children that had died before birth or shortly thereafter. The daughter's father was and still is unknown. The mother testified that she notified DHR that R.D. could be the daughter's biological father. Blackwood stated that DHR ceased all attempts to contact R.D. or to perform a home study on his residence because the mother claimed that R.D. was not the daughter's biological father during DHR's search for relatives to take custody of the daughter.
On June 28, 2002, two months before the termination hearing, the mother married J.O. ("the husband"), who testified at the hearing. The husband was divorced and is the father of 4 children who have lived with his mother-in-law for the past 10 years. The husband has made regular child-support payments to his mother-in-law and has exercised regular visitation with his children. The husband's residence is a five bedroom, two bath, modified mobile home. The husband is employed and earns a salary that varies from year to year; the husband testified that he earned $33,000 the year before the hearing in this matter.
According to the husband, he had known the mother for four months and was familiar with her past. The husband stated that he met the mother at the hospital after she had been physically abused by the boyfriend. The husband testified that the mother occasionally received telephone calls from the boyfriend and that he saw her at the boyfriend's house on one occasion. The mother testified that she was at the boyfriend's house to deliver milk to the boyfriend's grandchild; the mother testified that the boyfriend did not have transportation and the child desperately needed *Page 178 
milk. According to the mother, the husband "repo'd" the automobile she had driven to the boyfriend's house, thus stranding her there for 10 hours. The mother testified that she did not have sexual relations with the boyfriend on that occasion, but she stated that he did ask her to come back to him.
The husband testified that he went to a rehabilitation clinic for his marijuana abuse three years prior to the hearing in this matter. The husband stated that he and the mother had smoked marijuana and consumed beer at a party six days prior to the hearing in this matter. The husband testified that the mother was not intoxicated at that time and that he had not seen her intoxicated in the four months that they had known one another.
Section 26-18-7, Ala. Code 1975, sets forth the statutory authority for the termination of a parent's parental rights and provides, in pertinent part:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
 "(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
". . . .
 "(8) That parental rights to a sibling of the child have been involuntarily terminated.
 "(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
 "(1) Failure by the parents to provide for the material needs of the *Page 179 
child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
This court has stated that:
 "Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent's custody would be in the best interests of the child. M.H.S. v. State Dep't of Human Resources, 636 So.2d 419 (Ala.Civ.App. 1994).
 "'The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala. Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala. Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26-18-7(b), Ala. Code 1975.'
"M.H.S. v. State Dep't of Human Resources, 636 So.2d at 421.
 "Where a nonparent petitions to terminate a parent's parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952
(Ala. 1990). The trial court must first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the trial court's determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep't of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id."
A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App. 1997).
In her testimony, the mother stated that she used drugs during her previous pregnancies and that she could not recall whether she used drugs while she was pregnant with the daughter. The husband testified that the mother had smoked marijuana six days prior to the hearing in this matter. The trial court, in its order terminating the parental rights of the mother, noted the mother's use of drugs during her numerous pregnancies and her use of *Page 180 
drugs shortly before trial. The trial court was presented with clear and convincing evidence that the mother used drugs excessively and to such an extent as to render her unable to care for the needs of the daughter. § 26-18-7(a)(2), Ala. Code 1975.
The undisputed evidence indicates that the mother reported to DHR employees and to Harbor House employees that she had sexually abused the daughter at the direction of the boyfriend. The DHR and Harbor House employees recounted the mother's graphic statements and her detailed account of the daughter's sexual abuse to the trial court. Although the mother testified at the hearing in this matter that she lied about the daughter's abuse in order to obtain a restraining order against the boyfriend, we cannot say that the trial court erred by believing the DHR and Harbor House employees' testimony. The trial court was presented clear and convincing evidence that the mother brought the boyfriend to visitation with the daughter and that she has been to the boyfriend's residence at least once since she married the husband. The trial court was able to observe the DHR and Harbor House employees and the mother during their testimony. Based on the evidence, the trial court could have determined that the mother had sexually abused the daughter. §26-18-7(a)(3), Ala. Code 1975.
Finally, the mother's undisputed testimony indicated that her parental rights had been terminated as to her firstborn child. In its order terminating the mother's parental rights, the trial court noted that the mother's parental rights to her son had been terminated in Virginia. The trial court was presented clear and convincing evidence that the mother's parental rights to another child had been terminated. See §26-18-7(a)(8), Ala. Code 1975.
In this case, DHR sought to terminate the mother's parental rights; therefore, the trial court was required to find the child dependent and to consider viable alternatives to the termination of the mother's parental rights. Ex parte Beasley, 564 So.2d 950 (Ala. 1990). The trial court heard evidence that the entire list of relatives offered by the mother as alternatives to the termination of her parental rights were considered by DHR and were disqualified for valid reasons. Blackwood testified that the mother had told DHR during its investigation into relative resources that R.D. was not the father of the child, thus ending DHR's inquiry into him or his relatives as an alternative to termination. In its August 27, 2002, order, the trial court determined that the daughter was dependent, and it determined that no viable alternatives to the termination of the mother's parental rights existed.Ex parte Beasley, supra. The trial court's decision to terminate the mother's parental rights is presumed correct, and we cannot say that its decision is so unsupported by the evidence as to be plainly and palpably wrong. A.R.E. v. E.S.W., supra (citing M.H.S. v. State Dep't of HumanRes., 636 So.2d 419 (Ala.Civ.App. 1994)). The trial court's order terminating the mother's parental rights is due to be affirmed.
AFFIRMED.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur. MURDOCK, J., concurs in the result. *Page 181