865 So.2d 1228 (2003)
J.A.H.
v.
CALHOUN COUNTY DEPARTMENT OF HUMAN RESOURCES.
2020206.
Court of Civil Appeals of Alabama.
May 23, 2003.
Nancy P. Vernon of Maloney & Vernon, L.L.C., Jacksonville, for appellant.
William H. Pryor, Jr., atty. gen.; and J. Coleman Campbell, deputy atty. gen.; and Lynn S. Merrill and Connie M. Carraway, asst. attys. gen., Department of Human Resources, for appellee.
THOMPSON, Judge.
This case has previously been before this court. At the original hearing scheduled in this matter, M.H. ("the mother") and J.A.H. ("the father"), were represented by the same court-appointed attorney. Before the hearing began, the mother and the father separated; the court-appointed attorney ceased representing the father due to a conflict of interest. On April 3, 2002, the Calhoun Juvenile Court ("the trial court") terminated the mother's and *1229 father's parental rights to H.L.H. ("the child"). The father appealed and this court reversed the trial court's decision to terminate the father's parental rights and remanded the action to the trial court so that it could appoint counsel to represent the father. See J.A.H. v. Calhoun County Dep't of Human Res., 846 So.2d 1093 (Ala. Civ.App.2002).
On remand, the trial court appointed an attorney to represent the father. On November 21, 2002, the trial court held a hearing and terminated the father's parental rights. The father filed a timely appeal.
The father, who was 25 years old at the time of the hearing, testified that on August 20, 2001, he pleaded guilty to 4 counts of armed robbery. The father was sentenced to serve 4 consecutive 25-year terms of imprisonment and was incarcerated in the Ventress Correctional Facility. The father will not be eligible for parole until September 2009; at that time, the child will be 10 years old. At the time the hearing commenced, the father had not visited with the child in two years, even though he had been imprisoned for only one year and three months. The father testified that he did not know the child's date of birth.
Linda Bodenheimer, a clinical psychologist, evaluated the father in July 1999 by administering a series of tests. Based on those tests, Bodenheimer concluded that the father was depressed unless he was acting out against someone; Bodenheimer also concluded that the father was self-centered and did not respect authority. Bodenheimer testified that the father's intelligence was "borderline" and that his reading and writing skills were below average; however, she noted that the father had "street smarts." Bodenheimer noted that the father was most concerned with his own problems and that he did not put the child's needs ahead of his own. Bodenheimer acknowledged that she had not observed the father with the child, but she stated that, based on his psychological evaluation, it would be "extremely difficult" for the father to properly parent the child.
James Holiday served as the mother and father's marriage and family therapist, and he counseled the father individually. Holiday testified that, in the beginning, the father responded well to therapy and his overall well-being improved dramatically. According to Holiday, the father's financial situation worsened, and the Department of Human Resources ("DHR") then removed the child from his home. Additionally, Holiday testified that the father was unable to obtain permanent employment and that he lived in seven different residences during the course of the counseling. The father admitted to Holiday that he was abusing illegal drugs during the period that he was undergoing counseling. According to Holiday, the father's progress ceased and further attempts at counseling him failed.
Due to worsening financial conditions, the father was forced to take in boarders to pay his rent. According to Holiday's testimony, at least one of the boarders was discovered smoking marijuana in the father's residence; the father eventually forced that boarder to leave his residence. The residence itself was unkempt, filled with overturned ashtrays and scraps of uneaten food. Lorna Usrey, a DHR counselor, testified that the father admitted that, during the period that the father's financial situation was worsening, he and the mother began verbally abusing one another. Usrey also stated that the mother and the father both reported having sexual relations outside of the marriage.
Gloria Craig, a DHR employee, testified that the father's Individualized Service *1230 Plan ("ISP") required that he attempt to end his use of drugs and alcohol. According to Craig, the father failed every random drug screening that she supervised. Yvonne Gilley, the DHR program supervisor, testified that the father passed only one drug screening during DHR's involvement with him and the child. According to Gilley, the father did not comply with the ISP requirements that he improve his financial situation, end his drug use, and improve his marital relationship with the mother.
Craig was assigned to interview those relatives that might serve as an alternative placement for the child. The child was placed with B.H. ("the uncle") and C.H. ("the aunt") for approximately one month, but that placement ended at the aunt's request because she and the uncle were experiencing marital difficulties. The paternal grandmother was not considered as a relative placement because DHR was investigating allegations of child abuse and neglect made against her. The father's brother was contacted but indicated that he was financially unable to care for the child. J.H., whose name was listed as a relative placement, was disqualified when DHR discovered that he was not the child's blood relative. Craig noted that, during the search for relative placements, the father attended very few visitations with the child; however, she also noted that, during the visitations he did attend, he and the child interacted well.
Elaine Hubbard, a social worker who supervised the child's foster care, testified that DHR has had custody of the child since 2000. Hubbard stated that, at the time she was assigned to the child's case, the child was three years old and had been in DHR's custody for two years. At the time DHR took custody of the child, she had problems with her speech, and she was prone to kicking, hitting, and biting both people and objects. Hubbard visited the father in jail, seeking information about relative-placement options. Hubbard testified that the father only provided a list of first names of people to be considered as potential relative placements; that list did not contain addresses or phone numbers. Hubbard performed a home study on the paternal grandmother and stated that the paternal grandmother was very ill and that, financially, her debt far exceeded her income.
Stacey Rolfe, a DHR employee assigned to the foster-care and adoption unit, testified that the child has been diagnosed with fetal alcohol syndrome and a speech disorder. The child was receiving therapy and was enrolled in a behavior-modification plan devised by an agency referred to in the record as the "Mental Health Center." Rolfe reported that the child had been placed with a stable foster-care family and that DHR had arranged for the adoption of the child with an unspecified family if the father's parental rights were terminated. Rolfe testified that, except for the paternal grandmother, not one of the father's relatives had contacted DHR offering to serve as a placement for the child.
In its November 21, 2002, order, the trial court found that the child had been previously adjudicated dependent on July 12, 1999, and that she was still dependent at the time of the hearing in this matter. The trial court determined that, considering the evidence and the grounds for termination found in § 26-18-7, Ala.Code 1975, the father's parental rights should be terminated.
Section 26-18-7, Ala.Code 1975, sets forth the statutory authority for the termination of a parent's parental rights; it provides, in pertinent part:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents *1231 of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
"....
"(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
This court has stated:
"Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that *1232 removing the child from the parent's custody would be in the best interests of the child. M.H.S. v. State Dep't of Human Resources, 636 So.2d 419 (Ala.Civ. App.1994).
"`The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala.Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala.Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26-18-7(b), Ala.Code 1975.'
"M.H.S. v. State Dep't of Human Resources, 636 So.2d at 421.
"Where a nonparent petitions to terminate a parent's parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). The trial court must first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the trial court's determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep't of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id."
A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App.1997).
On appeal, the father argues that the trial court erred by admitting into evidence court reports, authored by DHR representatives, that were allegedly based on hearsay. The father cites this court's decision in Y.M. v. Jefferson County Department of Human Resources, [Ms. 2010755 Jan. 24, 2003]  So.2d  (Ala. Civ.App.2003), in support of his argument that the court reports contained inadmissible hearsay evidence. However, as this court noted in K.W. v. J.G., 856 So.2d 859 (Ala.Civ.App.2003), Y.M. was a plurality opinion.
Further, Y.M. can be distinguished factually from this case. In Y.M, the appellant/mother objected several times to the trial court's taking "judicial knowledge" of the court reports submitted to the trial court by DHR. In this case, however, the father did not object when DHR moved to admit reports that might contain hearsay. In K.W., this court held that a party may not raise an issue for the first time on appeal. K.W. v. J.G., supra (citing Andrews v. Merritt Oil Co., 612 So.2d 409 (Ala.1992), and Somers v. McCoy, 777 So.2d 141 (Ala.Civ.App.2000)). The record indicates that the father did not object to the introduction of any of DHR's court reports; therefore, we must affirm the trial court's admission of those reports.
The father also argues that DHR failed to search for any possible relative placements that existed as a viable alternative to the termination of his parental rights. The father, while incarcerated, *1233 presented Hubbard with a list of the first names of possible relative placements; that list did not contain those relatives' last names, phone numbers, or addresses. Despite the father's lack of cooperation in identifying possible relative resources, DHR found and investigated several of his family members; none of those placements were suitable. DHR placed the child with her aunt and uncle who, after one month, returned the child to DHR's custody. The paternal grandmother was disqualified because of her poor health and her financial difficulties and because DHR was investigating allegations of child abuse and neglect made against her. The father's brother was contacted and indicated that he was financially unable to care for the child. The testimony indicated that there were no other relatives that approached DHR about taking custody of the child. The trial court determined that DHR had presented clear and convincing evidence that DHR had searched for all viable alternatives to the termination of the father's parental rights.
The father makes no other arguments in his brief to this court. Given our standard of review and our review of the evidence, we must affirm the trial court's decision to terminate the father's parental rights and its determination that DHR did search for viable alternatives before terminating the father's parental rights. Ex parte Beasley, 564 So.2d 950 (Ala.1990); A.R.E. v. E.S.W., supra.
AFFIRMED.
YATES, P.J., and PITTMAN, J., concur.
CRAWLEY and MURDOCK, JJ., concur in the result.
CRAWLEY, Judge, concurring in the result.
Although I concur in the affirmance of the judgment terminating the parental rights of the father, I disagree with the statements in the opinion indicating that the holding in Y.M. v. Jefferson County Department of Human Resources, [Ms. 2010755, January 24, 2003]  So.2d  (Ala.Civ.App.2003), is somewhat less than authoritative because Y.M. was a plurality opinion. See my opinion concurring specially in E.W. v. Jefferson County Department of Human Resources, [Ms. 2010856, April 25, 2003] ___ So.2d ___, ___ (Ala. Civ.App.2003) (Crawley, J., concurring specially), which explains my opinion that the legal principle that hearsay is inadmissible in the adjudicatory phase of a termination proceeding was agreed with by a majority of this court.
MURDOCK, Judge, concurring in the result.
I concur in the result. I write separately to note my disagreement with the apparent implication in the main opinion's effort to discount Y.M. v. Jefferson County Department of Human Resources, [Ms. 2010755, Jan. 24, 2003] ___ So.2d ___ (Ala.Civ.App.2003), as only a "plurality opinion" that that opinion does not stand for the proposition that hearsay evidence that is otherwise inadmissible under our Rules of Evidence is not competent evidence with respect to the issue whether to terminate parental rights. See E.W. v. Jefferson County Dep't of Human Res., [Ms. 2010856, April 25, 2003] ___ So.2d ___, ___ (Ala.Civ.App.2003) (Murdock, J., concurring in the result).